# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 8, 2024         Decided August 15, 2025

No. 23-7051

NIA LUCAS,
APPELLANT

v.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,
(AFGE) AND AFGE LOCAL 228,
APPELLEES

———

Consolidated with 23-7054

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:22-cv-00777)
(No. 1:22-cv-01540)

———

*Joshua A. Matz* argued the cause for appellant. On the briefs were *David R. Dorey*, *Brian Wolfman*, and *Regina Wang*.

*Steven Winkelman*, Attorney, Equal Employment Opportunity Commission, argued the cause for *amicus curiae*

Equal Employment Opportunity Commission in support of appellant. With him on the brief were *Karla Gilbride*, General Counsel, *Jennifer S. Goldstein*, Associate General Counsel, and *Dara S. Smith*, Assistant General Counsel.

*Mark L. Vinson* argued the cause and filed the brief for appellees.

Before: PILLARD, PAN, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* PAN.

GARCIA, *Circuit Judge*: Nia Lucas, a former federal employee, filed charges against her union with the Federal Labor Relations Authority. She alleged that the union had mishandled an arbitration proceeding and discriminated against her based on sex and disability. Lucas then filed two lawsuits in district court asserting similar claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), and the Fair Labor Standards Act (FLSA). The district court dismissed the suits for lack of subject matter jurisdiction, ruling that the Federal Service Labor-Management Relations Statute (FSLMRS) precluded Lucas's claims. We affirm the dismissal of the FLSA claim but reverse the dismissal of the Title VII and ADA claims.

**I**

**A**

These appeals concern the interplay between the FSLMRS and three other federal statutes that regulate the workplace.

The first is Title VII of the Civil Rights Act of 1964, which prohibits employers and labor organizations from discriminating on the basis of race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a), (c). Plaintiffs who prove "unlawful intentional discrimination" under Title VII may recover compensatory and punitive damages. *Id.* § 1981a(a)(1). Congress established the Equal Employment Opportunity Commission (EEOC) to enforce Title VII and investigate charges of discrimination. *See id.* §§ 2000e-4(a), 2000e-5(a)–(b).

The second statute is the ADA, which prohibits discrimination against individuals with disabilities. *See id.* §§ 12101(b)(1), 12112(a). As in Title VII, the ADA applies to both employers and unions, *see id.* § 12111(2), and compensatory and punitive damages are available on the same terms to prevailing plaintiffs, *see id.* § 1981a(a)(2). And, as with Title VII, the EEOC enforces the ADA's employment-related provisions. *See EEOC v. Waffle House, Inc.*, 534 U.S. 279, 285 (2002).

The third statute is the FLSA, which is a wage-and-hour statute aimed at combatting "labor conditions detrimental to the maintenance of the minimum standard of living." 29 U.S.C. § 202(a). Most relevant here is the FLSA's anti-retaliation provision, which prohibits "any person" from "discharg[ing] or in any other manner discriminat[ing] against any employee" for engaging in activity that the statute protects. *Id.* § 215(a)(3).

Finally, we have the FSLMRS, which governs the role and responsibilities of unions in the federal workplace. *See* 5 U.S.C. § 7102. The FSLMRS imposes on federal unions a duty of fair representation, which makes them "responsible for representing the interests of all employees in the unit [they] represent[] without discrimination and without regard to labor organization membership." *Id.* § 7114(a)(1). The FSLMRS also proscribes unions from engaging in unfair labor practices

(ULPs), such as refusing to "negotiate in good faith," *id.* § 7116(b)(5), or calling any strike or work stoppage that "interferes with an agency's operations," *id.* § 7116(b)(7)(A).

As relevant here, three ULPs address union discrimination against employees. Two of them incorporate the duty of fair representation. *See id.* § 7116(b)(1), (8). That means that whenever a union fails to represent employees in a bargaining unit "without discrimination," *id.* § 7114(a)(1), those employees can file ULP charges under the FSLMRS. A third ULP explicitly mentions discrimination based on certain characteristics: A union may not "discriminate against an employee with regard to the terms or conditions of membership in the labor organization" based on race, sex, disability, or other protected traits. *Id.* § 7116(b)(4).[1]

The FSLMRS empowers the Federal Labor Relations Authority to investigate ULP charges. *See id.* §§ 7118(a)(1), 7104(f)(2). If the Authority finds that a union committed a ULP, it may issue a cease-and-desist order, award backpay, or take "such other action as will carry out the purpose of [the statute]." *Id.* § 7118(a)(7). The FSLMRS does not expressly provide for compensatory or punitive damages, or for attorney's fee awards.

The statute funnels ULP charges through a special review process. Congress passed the FSLMRS as part of the broader Civil Service Reform Act of 1978 (CSRA), which instituted an "integrated scheme of administrative and judicial review" of claims that arise within the federal civil service system. *United States v. Fausto*, 484 U.S. 439, 445 (1988). The CSRA

---

[1] There is yet another ULP that mentions discrimination, but it is not relevant to these appeals. *See* 5 U.S.C. § 7116(b)(2) (prohibiting unions from "caus[ing] or attempt[ing] to cause an agency to discriminate against any employee in the exercise by the employee of any right under [the FSLMRS]").

generally directs claims concerning personnel actions first to the Merit Systems Protection Board, and then to the Federal Circuit for judicial review. *See Fed. L. Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 555 (D.C. Cir. 2023). The FSLMRS establishes a similar scheme to process disputes related to union representation and collective bargaining. In broad strokes, the FSLMRS directs covered claims to the Federal Labor Relations Authority and then, if the Authority issues a final order, provides for judicial review in a court of appeals. *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump* (*AFGE II*), 929 F.3d 748, 752 (D.C. Cir. 2019).

The Authority has exclusive jurisdiction to adjudicate ULP charges in the first instance. *See Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263*, 489 U.S. 527, 532 (1989). The FSLMRS does not "furnish a parallel remedy in a federal district court to enforce" a federal union's responsibilities to the employees it represents. *Id.* District courts therefore lack subject matter jurisdiction over claims that a federal union committed a ULP. *See Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 966 (D.C. Cir. 1990).

To request the Authority's assistance, an employee must file a ULP charge with one of the Authority's Regional Directors. *See* 5 C.F.R. § 2423.6(a). That Regional Director may initiate a complaint and refer the case to an administrative law judge or dismiss the charge. *See id.* §§ 2423.10(a), 2423.20(a). If the Regional Director dismisses the charge, the employee may appeal to the Authority's General Counsel. *See id.* § 2423.11(c). The General Counsel can then either refer the matter to an administrative law judge or affirm the Regional Director's dismissal. *See id.* § 2423.11(f).

If an employee's case proceeds to an administrative law judge, she can appeal an adverse ruling to the Authority. *See id.* §§ 2423.40–.41. And, in turn, "[a]ny person aggrieved by

any final order of the Authority" may seek review in a federal court of appeals.  5 U.S.C. § 7123(a).

If, however, the Regional Director and General Counsel both dismiss the employee's ULP charge, the employee has no further recourse.  The General Counsel's decision not to file a complaint cannot be appealed to the Authority and is "not judicially reviewable." *Pat. Off. Pro. Ass'n v. FLRA*, 128 F.3d 751, 753 (D.C. Cir. 1997); *see also* 5 C.F.R. § 2423.11(f), (g).  The Authority, we note, has not had a General Counsel since 2017.  *See* Memorandum from Dana Rooney, Inspector Gen. to the Fed. Lab. Rels. Auth. 3 (Sept. 16, 2024), https://perma.cc/HQW2-8ZKP.  Thus, for most of the past decade, a Regional Director's decision dismissing a ULP charge has been, in practice, final and unreviewable.

**B**

At the motion-to-dismiss stage, we accept the factual allegations in Lucas's complaints as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Nia Lucas, a woman with a traumatic brain injury, worked for the U.S. Small Business Administration (SBA) from 2017 to 2020.  Lucas believed that the SBA had discriminated against her and had not compensated her properly.  In late 2017, she brought these allegations to her union's local chapter.

The local did not take any action for several months.  That changed when the local's new president, Johnnie Green, began his term in January 2018.  Not long after taking office, Green filed a workplace grievance against the SBA on Lucas's behalf.  Green told Lucas that the union "had a history of animus towards female bargaining unit employees with disabilities." Compl. (No. 22-cv-777) ¶ 31.  Two months later, Green scheduled an arbitration hearing on Lucas's grievance.

Around this time, Green began professing his love for Lucas and making unwanted sexual advances toward her.

Lucas told him to stop and reported his conduct to Michael Kelly, one of the union's national officers.

Green stepped down as Lucas's designated representative ahead of the arbitration hearing, but the two of them remained in contact as the hearing date approached. Lucas had recently given birth, and, on one occasion, Green told her that "she did not have a right or need to be at the arbitration hearing based on the additional expenses and logistics associated with her being a nursing mother." *Id.* ¶ 48. He added that Lucas's "having a newborn was a burden to the union." *Id.* ¶ 49. Lucas again reported his comments to Kelly.

At Green's instruction, the local postponed the arbitration hearing after it had begun. Six months later, Lucas filed a ULP charge with the Federal Labor Relations Authority, complaining of Green's harassment and the hearing's delay. After learning about the charge, Green called Lucas, told her she was a "b*tch," and threatened to "ruin her federal career" if she did not withdraw the allegations. *Id.* ¶ 64. The local later pulled out of the arbitration proceedings. Green explained that the union "did not want to represent disabled mothers of newborns such as [Lucas]." *Id.* ¶ 71.

Lucas filed two more ULP charges with the Authority: one asserting that the local had wrongfully withdrawn from the arbitration hearing, and another contending that Kelly had conspired with Green to restrict her rights as an employee in the union's bargaining unit.

It is unclear exactly what happened next. We know that the Regional Director dismissed two of the charges as untimely. Lucas appears to have appealed those dismissals to the General Counsel, where they will remain pending until a new General Counsel is appointed. The fate of Lucas's third charge is not evident from the record.

Separately, Lucas filed a discrimination charge against the union with the EEOC, which declined to pursue the matter and issued her a right-to-sue letter. Lucas then filed in district court the two lawsuits that are now before us. The first named the union and the local as defendants and alleged violations of Title VII and the ADA, including claims of sex discrimination, disability discrimination, sexual harassment, and hostile work environment. The second, which Lucas brought *pro se*, named the union, the local, Green, and Kelly as defendants. Lucas alleged that the local's delay of and withdrawal from the arbitration proceedings constituted unlawful retaliation in violation of the FLSA.[2]

In each case, the defendants filed a motion to dismiss for lack of jurisdiction. They argued that Lucas's claims were, in essence, allegations that the union had breached its duty of fair representation, and so she could seek relief only from the Federal Labor Relations Authority.

The district court granted the motions, reasoning that the charges Lucas had filed with the Authority concerned "the very same facts and circumstances" underlying her complaints. *Lucas v. AFGE*, 2023 WL 2682175, at *9 (D.D.C. Mar. 29, 2023). "[Lucas's] allegations," the court continued, "are properly characterized as a mere repackaging of her claims under the [FSLMRS] for breach of the duty of fair representation." *Id.* Relying on the Supreme Court's holding in *Karahalios* that only the Authority may adjudicate ULP charges, the district court ruled that Lucas could not file Title VII, ADA, and FLSA claims based on the same facts as her ULP charges.

---

[2] In addition to the FLSA retaliation claim, Lucas asserted a range of state-law claims in her second lawsuit. Those claims are not at issue in these appeals.

9

These appeals followed.

## II

We review the district court's dismissals for lack of subject matter jurisdiction de novo. *See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 446 v. Nicholson*, 475 F.3d 341, 347 (D.C. Cir. 2007).

The question before us is whether the FSLMRS precludes Lucas's claims under Title VII, the ADA, and the FLSA, and limits her to whatever claims and remedies she is afforded by the FSLMRS itself. To perform that inquiry, we look to the "terms, structure, and purpose" of the relevant statutes. *Ahuja*, 62 F.4th at 559.[3]

## A

We begin by addressing whether the district court properly dismissed Lucas's first lawsuit, which asserted claims under Title VII and the ADA. We conclude that the FSLMRS did not divest the district court of subject matter jurisdiction over that suit.

## 1

The defendants (whom we will refer to collectively as the "union") contend that the FSLMRS extinguishes federal employees' rights to bring Title VII and ADA claims against labor organizations, at least where the claims concern actions a union takes in its representative capacity. As detailed in Section II.A.3 below, this court and others have concluded that the FSLMRS precludes causes of action under certain other statutes. If that were so for Title VII and the ADA, federal

---

[3] The parties have also briefed several issues that the district court did not pass upon below. We review only the district court's jurisdictional ruling.

employees' only recourse for discrimination by their unions would be to pursue the materially weaker and more limited avenues for relief that the FSLMRS provides. Several features of the statutes' texts and contexts render it implausible that Congress intended that result.

To start, it is unlikely that Congress would have quietly done away with fundamental protections that it conspicuously and specifically made applicable to discrimination by unions. Title VII and the ADA represent two of the most "significan[t]" legislative enactments of "our time." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 649 (2020); *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). Moreover, both statutes explicitly apply their prohibitions against discrimination to "labor organizations." *See* 42 U.S.C. § 2000e-2(c) (Title VII describing what "shall be an unlawful employment practice for a labor organization"); *id.* § 12111(2) (ADA defining "covered entity" to include "labor organization[s]").[4] That is, the plain text of these statutes reflects Congress's considered, specific judgment that labor organizations be subject to them. And, contrary to the union's reading of the FSLMRS to implicitly displace that arrangement, we have a general "presumption that Congress legislates against and preserves existing law and background understandings," *United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021), and a party arguing otherwise shoulders a

---

[4] Lucas asserted her disability-related claims under Title II of the ADA, which prohibits the exclusion of people with disabilities from "the services, programs, or activities of a public entity." 42 U.S.C. § 12132. On appeal, the parties do not focus on Title II specifically. Instead, they either discuss the ADA as an undifferentiated whole or cite Title I, which prohibits disability discrimination in employment, *see id.* § 12112. The union's position is that the FSLRMS precludes discrimination claims under the ADA writ large, and we address that argument by drawing on Title I as appropriate.

"heavy burden," *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018).

Consistent with how fundamental these statutory protections are, Congress has long afforded claimants multiple, overlapping avenues to obtain relief from the discrimination they prohibit. Thus, it is well-settled that employees in every other relevant context can concurrently pursue administrative remedies for discrimination *and* Title VII or ADA claims (or the materially identical Rehabilitation Act claim) in federal district court.[5] For federal employees suing their employers, this is explicit in 5 U.S.C. § 2302, part of Title I of the CSRA. Section 2302(b) makes it a prohibited personnel practice for covered supervisors to discriminate against employees or applicants in violation of, among other statutes, Title VII or the Rehabilitation Act. *See* 5 U.S.C. § 2302(b)(1)(A), (D). And Section 2302(d) then explicitly ensures that these employees may nevertheless concurrently bring claims under Title VII and the Rehabilitation Act in district court. *See id.* § 2302(d)(1), (4).

Similarly, private-sector employees may bring Title VII and ADA claims in district court against their unions even if they can also pursue overlapping administrative remedies before the National Labor Relations Board. *See Macklin v. Spector Freight Sys., Inc.*, 478 F.2d 979, 996–97 (D.C. Cir. 1973) (noting, in the context of claims based on race discrimination, "concurrent jurisdiction in EEOC, the NLRB, and the District Courts over employer and union discrimination

---

[5] Title II of the ADA is interpreted alongside Section 504 of the Rehabilitation Act, as if the two statutes were one law. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008). Similarly, Section 501 of the Rehabilitation Act, which prohibits disability discrimination in federal employment, is governed by the same standards as Title I of the ADA. *See* 29 U.S.C. § 791(f).

against employees"); *Figueroa v. Foster*, 864 F.3d 222, 233 (2d Cir. 2017) ("A union, therefore, is subject to liability under both the NLRA's duty of fair representation and under Title VII, as well as under other federal anti-discrimination statutes enforced by the EEOC."). The Supreme Court has recognized that "legislative enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974).

Since the CSRA's 1978 enactment, Congress has either created or enhanced remedies for discrimination claims without ever hinting that federal employees suing their unions were excluded in any respect from the statutes' protections. The ADA itself was enacted twelve years after the CSRA and the FSLMRS and, again, it defined its coverage to include all "labor organization[s]," not just private-sector unions. 42 U.S.C. § 12111(2). Similarly, the Civil Rights Act of 1991 made compensatory and punitive damages available to a plaintiff who establishes "unlawful intentional discrimination" in violation of Title VII or the ADA. *Id.* § 1981a(a)(1)–(2). There is no indication that Congress understood this enhancement not to apply to federal employees suing their unions.[6]

---

[6] The general rule of overlapping remedies for discrimination is also consistent with how the Federal Labor Relations Authority seems to view its role within the remedial scheme. The Authority's website directs employees who believe they have been "discriminated against" to "contact the Equal Employment Opportunity Commission" or the "EEO Office at [their] agency." *ULP Frequently Asked Questions (FAQs)*, Fed. Lab. Rels. Auth., https://perma.cc/7R99-7C5C (choose "Who the FLRA Helps"). If the union is right about the FSLMRS's preclusive effect, then the Authority has been sending many aggrieved employees on a fool's errand. And, consistent with the Authority's understanding of how the statutes overlap, the EEOC's own guidance contemplates that a

With the norm of overlapping remedies for discrimination in mind as compelling evidence in Lucas's favor, we would expect the union to proffer significant countervailing evidence that, in enacting the FSLMRS, Congress implicitly intended a radical departure. The union has not done so. It points to two features of the CSRA as support for its view that Congress meant to deprive federal employees suing their unions—only those employees, and only when they seek to hold their unions, rather than their employers, accountable for invidious discrimination—of the ability to bring Title VII and ADA claims in district court. Neither of the union's statutory arguments persuades us that Congress intended that result.

First, the union emphasizes that Congress made discrimination against employees a ULP and channeled all ULP charges to the Federal Labor Relations Authority's exclusive jurisdiction. *See* 5 U.S.C. § 7114(a)(1). The union's position is essentially that because the FSLMRS creates *a* remedy for discrimination, that must be the *only* remedy Congress intended. But given the norm of concurrent, overlapping remedies for discrimination, the union's conclusion does not follow from its premise. The FSLMRS's mentions of discrimination are perfectly consistent with Lucas's view that Congress hewed to its longstanding practice of affording employees multiple avenues for relief in this particular context. Indeed, a more natural reading of the FSLMRS is that Congress meant to complement existing remedies by providing employees who might lack the resources to file a Title VII or ADA claim with a faster and less expensive means to obtain relief, albeit with a far more modest payoff.

---

plaintiff may pursue both FSLMRS and Title VII or ADA remedies against a federal union for discriminatory behavior. *See* EEOC's Brief 19–20 (citing EEOC Compliance Manual § 2-III(B)(1)(c)).

Again, providing two complementary routes to relief in this context would be the norm, not an aberration.

That logic would hold even if the FSLMRS offered redress commensurate to Title VII and the ADA. The remedies explicitly guaranteed in the FSLMRS, however, are paltry by comparison. It is particularly implausible that Congress would so drastically curtail federal employees' protections from discrimination by their unions without ever saying it was doing so, and without any apparent justification.

The union would have us hold that federal employees suing over discriminatory representation have no explicit statutory entitlement to compensatory damages, punitive damages, or attorney's fee awards—remedies that Congress has expressly guaranteed under Title VII and the ADA to "mak[e] victims whole" while "encouraging private enforcement . . . and deterring future violations of federal law." H.R. Rep. No. 102-40, pt. 1, at 65 (1991) (compensatory and punitive damages); *see also id.* at 75 (attorney's fees). Instead, for employees who demonstrate misconduct by federal unions, the FSLMRS appears to offer only cease-and-desist orders and, if applicable, backpay awards.

And even those limited remedies are subject to an administrative scheme that, in practice, almost never results in judicial review. Unlike a Title VII or ADA claim, federal employees cannot bring a ULP charge directly to a district court. Instead, their charges of discrimination are subject to the discretion of the Regional Director and the unreviewable discretion of the General Counsel (if and when one is appointed, *see supra* at 6) over whether to initiate a complaint. And by one account based on seven years of data, fewer than 1% of ULP charges filed by individuals against unions result in a complaint; nearly all other such ULP charges are either withdrawn or dismissed. *See* David Osborne, *Federal Labor*

*Board Records Show Challenge of Union Accountability* 2 (Apr. 2023).

The statutes' respective limitations periods also differ. The FSLMRS gives employees only six months to file a ULP charge, while a discrimination charge under Title VII or the ADA "may be filed up to 300 days after the challenged conduct" if an employee first seeks relief from a state or local agency. EEOC's Brief 16.[7]

Further, Lucas and the EEOC (as amicus) make a substantial case that the FSLMRS provisions are not just weaker than Title VII and the ADA in terms of procedure and remedies, but also more limited in terms of substantive coverage. Start with the duty of fair representation. As Lucas and the EEOC note, the Supreme Court has observed that "[a]ny substantive examination of a union's performance . . . must be highly deferential, [in light of] the wide latitude that negotiators need for the effective performance of their bargaining responsibilities." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991). In the context of private-employee claims, the Supreme Court has emphasized that because "a breach of the union's duty of fair representation may prove difficult to establish," it is all the more "noteworthy that Congress thought it necessary to afford the protections of Title VII against unions as well as employers." *Gardner-Denver Co.*, 415 U.S. at 58 n.19.

Indeed, several courts of appeals have held that proving a breach of the duty of fair representation requires a showing beyond what is necessary to make out a Title VII or ADA

---

[7] That disparity could make a difference here: The Authority dismissed many of Lucas's FSLMRS charges as untimely. The union has not offered a similar defense to most of her claims under Title VII and the ADA, but its position would bring them under the FSLMRS's time bar. *See* EEOC's Brief 17 n.2

claim.  *See Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 864 (9th Cir. 2016); *Peeples v. City of Detroit*, 891 F.3d 622, 636–38 (6th Cir. 2018); *Green v. Am. Fed'n of Tchrs./Ill. Fed'n of Tchrs. Loc. 604*, 740 F.3d 1104, 1105–07 (7th Cir. 2014).  If that is true, stripping federal employees of Title VII's and the ADA's protections from discrimination by their unions would put some misconduct beyond the law's reach.

If a claim centered on the duty of fair representation is unavailable, Lucas's only other option under the FSLMRS would be to invoke Section 7116(b)(4).  That provision makes it a ULP for a union to discriminate in the "terms or conditions of [its] membership" based on race, disability, and other protected traits.  5 U.S.C. § 7116(b)(4).  At first blush, Section 7116(b)(4) might seem similar in scope to Title VII and the ADA, but its focus on discrimination in membership could limit its applicability.  Lucas and the EEOC submit that Section 7116(b)(4) does not protect employees who decide against joining their union, but who belong to a bargaining unit that a union represents.  That includes Lucas, who herself was not a member of the union at the time relevant to her allegations.  *See* J.A. 27 (complaint exhibit noting that Lucas was not a "dues paying member"); J.A. 83 (union recognizing that Lucas alleged only "that she was a bargaining unit employee," not "that she was a member of [the local]").

Title VII, by contrast, contains no such limitation.  Instead, Title VII makes it unlawful for a union "to exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of [a protected trait]."  42 U.S.C. § 2000e-2(c)(1) (emphasis added).  According to Lucas and the EEOC, this "otherwise" clause explicitly sweeps in discrimination by unions against non-members.  The ADA's language is similarly expansive.  *See id.* § 12112.  On this understanding, a non-union member like Lucas can seek relief for discriminatory representation under Title VII and the ADA, but not under Section 7116(b)(4).  The union does not argue

otherwise, and, tellingly, it does not discuss Section 7116(b)(4) in its brief.

The Federal Labor Relations Authority does not appear to have any published decisions addressing when a union's discrimination based on protected traits breaches its duty of fair representation. Nor, for that matter, has the Authority clarified whether a non-member can bring a claim under Section 7116(b)(4). That dearth of authority likely stems from the reality that virtually all ULP charges filed by individuals against labor organizations are either withdrawn or dismissed. *See* Osborne, *supra*, at 2. When a charge is dismissed, the Authority does not issue an official decision. Instead, the General Counsel "provide[s] the person making the charge a written statement of the reasons for not issuing a complaint," leaving no public trace of the Authority's application of the ULPs to particular facts. 5 U.S.C. § 7118(a)(1). As a result, the Authority's decisions to date offer no response to Lucas's and the EEOC's contention that the duty of fair representation hardly rivals the protections available under Title VII and the ADA.

We do not resolve whether Lucas and the EEOC have the best reading of the FSLMRS on these issues. It is significant enough for present purposes to note that there are serious and unanswered questions about the FSLMRS's scope, and that those ambiguities further undermine the union's request that we divine from the FSLMRS's text a congressional intent to displace Title VII and ADA remedies. And even if the scope of the FSLMRS's coverage perfectly overlapped with that of Title VII and the ADA, the stark disparities in remedies, opportunities for judicial review, and limitations periods would remain.

Having disposed of the union's first statutory argument, we turn now to the second feature of the CSRA that supposedly reflects Congress's intent to extinguish claims like Lucas's.

This time, the union calls our attention to Section 2302 in Title I of the CSRA, which prohibits discrimination by federal agencies against their employees. Section 2302(d), referenced above, explicitly preserves federal employees' ability to bring Title VII and other specific statutory claims in district court, notwithstanding the availability of administrative remedies. The FSLMRS does not do the same for those employees' claims against their unions. The union argues that Congress evidently knew how to craft a savings clause and must have decided not to include one in the FSLMRS. And it asks us to draw a negative inference that Congress did intend to preclude these claims on the theory that "the presence of a phrase in one provision and its absence in another reveals Congress' design." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 436 (2002).

The negative inference the union seeks to draw from Section 2302's savings clause would hold together only if the FSLMRS provisions were otherwise identical to the Title I provisions. As the Supreme Court has put it, this type of negative inference "grows weaker with each difference in the formulation of the provisions under inspection." *Id.*; *see also Nat'l Postal Pol'y Council v. Postal Regul. Comm'n*, 17 F.4th 1184, 1191 (D.C. Cir. 2021) (explaining that this reasoning "has limited force" when "the two provisions use different words and are not otherwise parallel"). And here, there is a fundamental difference between the two provisions: Unlike in the FSLMRS, Congress in Section 2302(b) chose to explicitly define prohibited personnel practices based on Title VII and other specific statutes by name. *See* 5 U.S.C. § 2302(b). That labeling gave rise to the obvious implication that Congress intended to funnel those statutory claims exclusively through the CSRA scheme. Confronted with that implication, Congress carefully specified that employees could still concurrently pursue these claims in district court. *See id.* § 2302(d).

If the FSLMRS defined violations of Title VII and other specific statutes as ULPs, and then omitted the carveout that is present in Section 2302(d), the union's argument would be a sure winner. In that scenario, the omission of a savings clause would be the "sole difference" between the provisions. *Ours Garage*, 536 U.S. at 435.

But that is not how the FSLMRS provisions are structured, and so the union's argument falls apart. None of the FSLMRS provisions that encompass discriminatory conduct explicitly reference any antidiscrimination statute. Although the union insists that Congress must have intended for the FSLMRS to extinguish the statutory causes of action cited in Section 2302(d), Congress likely did not provide a carveout because it simply did not think the FSLMRS was naturally read as precluding those claims.

Against that backdrop, the treatment of these causes of action in Section 2302 is better read as a strong point for Lucas: In Section 2302, the one context where Congress was squarely presented with the question whether federal employees should have concurrent CSRA-based and district court remedies for these types of discrimination, Congress chose to be clear that employees did have such concurrent rights. That leads us back to the fundamental question that pervades this case: *Why would Congress have intended to extinguish federal employees' Title VII and ADA remedies and depart from the general norm of overlapping remedies only when they seek to sue their unions, and not when they sue their employers?*

The union has no meaningful answer. The most direct theory the union has offered is that, in passing the FSLMRS, Congress generally sought to place federal unions on a stronger footing. *See* Appellees' Brief 2. But the case the union cites to support that contention suggests that Congress wanted to bolster federal unions' strength vis-à-vis federal agencies in collective bargaining. *See Bureau of Alcohol, Tobacco &*

*Firearms v. FLRA*, 464 U.S. 89, 92 (1983) (noting that the FSLMRS "significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain 'an effective and efficient Government'" (quoting 5 U.S.C. § 7101(b)). The union has identified no support—and we cannot find any, in law or reason—for the idea that Congress wanted to give federal unions more freedom to engage in invidious discrimination against the very employees they are obligated to represent.

It is also true that Congress passed the CSRA largely to streamline preexisting litigation and consolidate review of similar issues in a single forum. *See Ahuja*, 62 F.4th at 559. But "[n]o statute pursues a single policy at all costs." *Bartenwerfer v. Buckley*, 598 U.S. 69, 81 (2023). And here, as discussed, we have no reason to think that the CSRA went so far as to displace all other statutory discrimination claims. Moreover, to the extent the legislative history sheds any light on our interpretive question, Congress's concern with duplicative and lengthy litigation was plainly more front of mind in the context of federal employees challenging their *employers'* actions, rather than in the context of employees suing their unions. *Compare* S. Rep. No. 95-969 at 3, 9 (1978) (emphasizing that "delays" and the "lengthy and complex appeals processes" frustrated agencies' efforts to remove and discipline employees), *with id.* at 7–8 (describing the creation of the Federal Labor Relations Authority as motivated by the need to consolidate review before a single administrative body and to ensure that body was free from conflicts of interest). Yet, as explained, Congress was perfectly happy to tolerate dual-track discrimination claims against federal agencies.

### 3

Lacking support for its position in the statutory text or context, the union relies heavily on language in our CSRA and FSLMRS precedent describing the statutes' preclusive force in

broad terms. The union argues that our caselaw treats the FSLMRS as effectively preempting the field, so that when it comes to remedies for the conduct of a federal employee's union, all that employee gets is whatever the FSLMRS prescribes. *Cf. Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) ("[W]hat you get under the CSRA is what you get."). For example, we have concluded that Congress's choice in the CSRA to provide and not provide particular remedies to different types of employees was "intentional[]," so that the CSRA precludes review under certain other statutes "even when that scheme provides no judicial relief." *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009); *Carducci v. Regan*, 714 F.2d 171, 174 (D.C. Cir. 1983). We have reached similar results in cases where federal employees brought labor-management claims in district court rather than under the FSLMRS's review scheme. *See, e.g.*, *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force* (*AFGE I*), 716 F.3d 633, 636 (D.C. Cir. 2013).

The rationale of those cases, however, is not as categorical as the union insists, and it does not apply here. Our precedent has generally asked whether the CSRA and FSLMRS preclude a cause of action under a certain kind of federal statute: "general," "catchall" statutes that could cover "a vast number of cases" that Congress intended to funnel through the CSRA's process of administrative review instead of through district courts. *Lacson v. DHS*, 726 F.3d 170, 176 (D.C. Cir. 2013) (cleaned up).

The Administrative Procedure Act—the most frequent basis for attempts to circumvent the CSRA—is illustrative. It allows any person aggrieved by agency action to challenge that action as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). If the CSRA did not preclude APA claims addressing employment disputes, a savvy litigant could recast just about any such dispute with her employer as an APA suit, giving rise

to a parallel proceeding in district court. That is why we have repeatedly concluded that plaintiffs "may not circumvent the [CSRA's] requirements and limitations by resorting to the catchall APA to challenge agency employment actions." *AFGE I*, 716 F.3d at 636 (quoting *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009)); *see also Filebark*, 555 F.3d at 1010; *Ahuja*, 62 F.4th at 562; *Carducci*, 714 F.2d at 172; *Fornaro*, 416 F.3d at 67; *Nyunt v. Charmain, Broad. Bd. of Governors*, 589 F.3d 445, 448–49 (D.C. Cir. 2009).

A similar concern underlay the Supreme Court's decision in *United States v. Fausto*, 484 U.S. 439 (1988). *Fausto* addressed whether the CSRA precluded district court suits under the Back Pay Act, which entitles employees to lost wages whenever they are "affected by an unjustified or unwarranted personnel action." *Id.* at 454 (quoting 5 U.S.C. § 5596(b)(1)). Like the APA, the Back Pay Act could conceivably apply to any employment-related dispute, so long as the dispute affected the employee's wages. It was therefore "obvious" that permitting a Back Pay suit in district court "would undermine" the CSRA's remedial scheme. *Id.* at 451; *see also Lacson*, 726 F.3d at 176 (recognizing *Fausto*'s anti-circumvention rationale).

Likewise, in *Spagnola v. Mathis*, 809 F.2d 16 (D.C. Cir. 1986), we held that the CSRA precluded claims under 42 U.S.C. § 1985(1). We rejected the view that Section 1985(1) was a "narrow and limited remedy" and instead described it as "a statute cast in general language of broad applicability." *Id.* at 29 (cleaned up). That is because the statute provides access to the courts whenever two or more people conspire to "impede [an employee] in the discharge of his official duties." *Id.* at 28 (quoting 42 U.S.C. § 1985(1)). We reasoned that the CSRA's preclusive effect on Section 1985(1) claims followed from our precedent dealing with similarly broad causes of action, including the APA. *See id.* at 30. We then invoked the

principle that a "precisely drawn, detailed statute preempts more general remedies." *Id.* (quoting *Brown v. GSA*, 425 U.S. 820, 834 (1976)).[8]

Title VII and the ADA do not suffer from the same "defect of generality" as the APA and the other causes of action we have found the CSRA and FSLMRS to preclude. *Lacson*, 726 F.3d at 176. Neither Title VII nor the ADA is a catchall statute. Instead, both statutes address the specific evils of invidious discrimination by labor organizations, rather than labor-management relations writ large. Similarly, there is no concern that every ULP charge under the FSLMRS could give rise to a parallel Title VII or ADA claim, as unions can commit nearly all of the ULPs in the FSLMRS without acting on any discriminatory animus whatsoever. We therefore are not presented with the same fear that allowing claims like Lucas's to proceed would swallow the CSRA or FSLMRS whole.

This statute-specific analysis—rather than the categorical preclusion rule the union urges—is reinforced by our rationale and holding in *Lacson*. There, we permitted a federal air marshal to pursue a "specific[]" cause of action provided by 49 U.S.C. § 46110, under which an interested party may seek judicial review of an order issued by the Under Secretary of Transportation. 726 F.3d at 176. We held that the marshal's suit under Section 46110 could proceed even though the order

---

[8] It is true that *Spagnola* describes our precedent as holding that the CSRA "seems to . . . preclude[] resort to other statutory schemes for aggrieved federal employees raising nonconstitutional claims against their employers." 809 F.2d at 30. But that statement cannot be divorced from the context of the decision, which emphasized just how general § 1985(1) was. Moreover, *Spagnola* (a panel opinion we vacated in part and reheard *en banc*, *see Spagnola v. Mathis*, 859 F.2d 223, 224 (D.C. Cir. 1988) (en banc) (per curiam)) did not concern the FSLMRS and had no occasion to consider the CSRA's special treatment of discrimination claims.

at issue formed "much of the legal basis" for his termination, over which the Merit Systems Protection Board, per the CSRA's review scheme, had exclusive jurisdiction. *Id.* at 175.

As we explained in *Lacson*, a variety of statute-specific considerations inform our analysis of the CSRA's preclusive effect, including the breadth of the statute under which the employee seeks relief, the statute's text, and the timing of its enactment. *See id.* at 176–77. We have already detailed the numerous unique statutory considerations that favor Lucas's position here. But on the generality metric that *Lacson* and our other cases have focused on, Lucas comes out ahead again.

The union also draws on language from our precedent stating that the CSRA can preclude constitutional and statutory causes of action "even if that ma[kes] it impossible to obtain particular forms of review or relief." *AFGE II*, 929 F.3d at 756 (emphasis omitted). Here, too, context is critical. We used this "impossibility" language to describe a specific subset of cases: our precedent holding that plaintiffs cannot bring systemic or nationwide challenges to policies or practices that, if litigated through specific bargaining disputes or employment grievances, would fall within the CSRA's preclusive sweep. For example, in *AFGE I*, unions could not sue to invalidate Air Force Instructions on a "nationwide" basis when they could challenge the Instructions on a "local-by-local" basis through grievances, ULP charges, and negotiability disputes. 716 F.3d at 639. We have likewise held that unions cannot circumvent the CSRA by bringing systemic challenges to Executive Orders and guidance documents. *See AFGE II*, 929 F.3d at 757–59; *Ahuja*, 62 F.4th at 560–62.

These cases are materially distinguishable from Lucas's. Lucas does not bring a systemic attack on practices she would otherwise have to challenge before the Federal Labor Relations Authority. Instead, she seeks to sue her union for specific acts that she claims were discriminatory, under statutes that

specifically target such conduct. And Lucas cannot litigate her Title VII and ADA claims "through the statutory scheme in the context of concrete bargaining disputes." *AFGE II*, 929 F.3d at 757. The union's position is that Lucas cannot litigate those claims *at all*, and instead must resort to a watered-down ULP charge.

**4**

The union appeals to one last strain of precedent: the framework the Supreme Court developed in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to discern the scope of a remedial scheme's preclusive effect. The *Thunder Basin* inquiry unfolds in two steps. First, we ask whether congressional intent to "allocate[] initial review to an administrative body . . . is 'fairly discernible in the statutory scheme.'" *Id.* at 207 (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 351 (1984)). Second, we ask whether the claim at issue is "of the type Congress intended to be reviewed within th[e] statutory structure." *Id.* at 212.

We doubt that *Thunder Basin* is the right frame of analysis in this case. That framework is typically applied to determine where a claim should first be brought—often whether the claim can be brought in federal district court under general federal question jurisdiction or instead whether it must be presented to an agency and then a particular reviewing court or courts per a special statutory review scheme. *See, e.g.*, *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 185 (2023); *Elgin v. Dep't of Treasury*, 567 U.S. 1, 10 (2012) ("Like the statute in *Thunder Basin*, the CSRA does not foreclose all judicial review of petitioners' constitutional claims, but merely directs that judicial review shall occur in the Federal Circuit."). The question we confront today is different, because the union's claim is that Lucas cannot bring her statutory Title VII and ADA claims *in any venue*. When the argument is that a statutory review scheme completely extinguishes a plaintiff's rights under another

federal statute, we have generally not applied the *Thunder Basin* framework. *See, e.g.*, *Filebark*, 555 F.3d at 1012–15; *Grosdidier*, 560 F.3d at 497–98; *AFGE I*, 716 F.3d at 637–39.

In any event, insofar as *Thunder Basin* is instructive, it supports Lucas. The parties' arguments turn on *Thunder Basin*'s second step, which asks whether Lucas's claim is of the type that Congress channeled through the FSLMRS's remedial scheme. Three factors guide our thinking: first, whether "a finding of preclusion could foreclose all meaningful judicial review"; second, whether the claim is "wholly collateral" to the statutory scheme; and, third, whether "agency expertise could be brought to bear" to resolve the claim. *Thunder Basin*, 510 U.S. at 212–15 (cleaned up).

The first of these three factors is all but dispositive here. Unless Lucas can proceed with her Title VII and ADA lawsuit, she will have no meaningful opportunity for judicial review of her discrimination allegations (even in ULP garb) because her access to the courts will be subject to the General Counsel's unreviewable discretion to dismiss her charges. Indeed, as noted, an unreviewable dismissal is the fate met by nearly every ULP charge filed by federal employees against their unions. *See* Osborne, *supra*, at 2. The second factor (collateralism) can be "analyzed together" with the first. *AFGE II*, 929 F.3d at 759; *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 490 (2010) (assessing first two factors together). The union has a more compelling argument as to the third *Thunder Basin* factor (agency expertise), as we do not doubt that the Federal Labor Relations Authority's familiarity with arbitration proceedings and ULP charges would be relevant to Lucas's claims. But the Authority also claims no particular expertise in the generally applicable antidiscrimination laws at issue in this case and has itself directed federal employees with such claims to seek assistance from other quarters. *See ULP Frequently Asked Questions (FAQs)*, Fed. Lab. Rels. Auth., https://perma.cc/7R99-7C5C

(choose "Who the FLRA Helps"). At any rate, the third factor on its own does not tip the *Thunder Basin* scales in the union's favor, especially when the prospect of meaningful judicial review is so remote.

**5**

With the union's arguments behind us, we turn to the rationale the district court gave for why, in its view, the FSLMRS precluded Lucas's Title VII and ADA claims. The district court did not entirely embrace the union's broad position that "Congress channeled nearly every type of claim a person may have against a covered labor organization through the CSRA's administrative scheme." Appellees' Brief 3. Instead, its ruling rested largely on the fact that Lucas had submitted ULP charges with materially similar factual contentions to the Federal Labor Relations Authority before filing her lawsuits. *See Lucas*, 2023 WL 2682175, at *9. The district court regarded her complaints as a "mere repackaging" of her ULP charges, and it reasoned that exercising jurisdiction "would provide [Lucas] with a 'parallel remedy in a federal district court to enforce the duty of fair representation.'" *Id.* (quoting *Karahalios*, 489 U.S. at 532).

We disagree with that estoppel-like approach. On that view, the FSLMRS's preclusive force would be at its apex when an employee has already filed ULP charges alleging the "same facts and circumstances" described in the complaint. *Id.* We cannot agree, however, that an employee's decision about where to first seek relief is an accurate or appropriate barometer of federal courts' subject matter jurisdiction. As we have explained, the FSLMRS's preclusive effect on other causes of action depends on a range of statute-specific considerations, *see Lacson*, 726 F.3d at 176, not whether an employee filed a ULP charge before turning to the courts.

Our dissenting colleague would hold that the FSLMRS extinguished Lucas's right to sue her union under Title VII and the ADA. We close with a few high-level observations about the nature of our disagreement.

The dissent could be read to argue for either of two distinct rules of decision. At times, the dissent urges that the FSLMRS automatically and categorically precludes any non-FSLMRS cause of action a federal employee may have against her union. *See, e.g.*, Dissenting Op. 19–20. The dissent attempts to ground that rule in dicta from our cases about the CSRA's interaction with broad, catchall statutes. We have explained already why those cases are not dispositive here. *Supra* at 21–25. We add only two observations. First, if those cases truly stood for the categorical rule the dissent ascribes to them, our decisions in this area would be considerably more concise (and *Lacson* would be wrong). Second, the dissent's rule would suggest that federal employees could not sue their unions even for intentional torts like defamation and assault, as the FSLMRS nowhere explicitly preserves those claims. Even the union concedes that such causes of action should not be preempted, *see* Appellee's Brief 34, and the dissent offers no reason to think that Congress intended them to be. Unless the dissent is willing to embrace that extreme result, the bounds of the CSRA's preclusive effect must be drawn somewhere, and dicta from cases addressing other statutory causes of action cannot tell us where those bounds lie.

At other times, the dissent suggests a very different rule. In this version, the FSLMRS ousts courts of jurisdiction to hear any claim "that appears on its face to be an unlawful labor practice under the CSRA." Dissenting Op. 2. Putting aside

that language's inapposite provenance,[9] it would be a quite difficult rule for district courts to apply. Discerning whether a claim is a ULP "on its face" would require clarity as to both the factual allegations in question and the conduct that each of the ULPs prohibits. As detailed *supra* at 17, however, there are very few judicial or Federal Labor Relations Authority decisions interpreting the FSLMRS's ULP provisions. To take this case as an example, the dissent confidently declares that the union's alleged misconduct here is "on its face" a breach of the duty of fair representation. Dissenting Op. 18 (quotation omitted). But the dissent cites no caselaw or other reason to believe that is so, except that Lucas alleged as much in her charges to the Authority.

Nor is it clear how district courts would apply the dissent's "on its face" standard in practice. Would a district court need to ask if the allegations in the complaint state a successful ULP charge? A plausible charge? Something else? The dissent does not say. Whatever the answer, the dissent's approach would require district courts to engage in an unenviable case-by-case assessment simply to determine if they have jurisdiction. Congress generally does not intend for jurisdictional rules to "invite extensive threshold litigation" that "could present serious difficulties for district courts."

---

[9] The dissent draws the "on its face" language from *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 966 (D.C. Cir. 1990), which held that federal employees must exhaust their administrative remedies under the CSRA before raising constitutional claims in an Article III court. *Id.* at 967–68. *Steadman* explained that the employees could raise their constitutional claims after exhausting their fair representation claims. It bears repeating that this case does not concern exhaustion, but rather whether district courts are entirely without jurisdiction over federal employees' Title VII and ADA claims against their unions.

*Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 464 n.13 (1980) (citation modified).

The dissent also criticizes our discussion of Title VII, the ADA, and the norm of concurrent, overlapping remedies for discrimination claims. It accuses us of "'disregard[ing]' [the CSRA's] 'text in favor of alleged congressional intent divined from *other* statutes.'" Dissenting Op. 29 (quoting *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024)). But there is nothing remarkable about us considering the particular statutes at issue in this case. *See Lacson*, 726 F.3d at 176 (illustrating how preclusion inquiry can vary by statute). As we have explained, Congress's special solicitude for discrimination claims is manifest in Title VII, the ADA, and even the CSRA. Most notably, the CSRA explicitly preserved federal employees' ability to pursue overlapping remedies when they sue their employers for discrimination. And, for all the reasons we have given, we are unpersuaded that Congress intended to extinguish such claims when those same employees seek to sue their unions for similar misconduct.

Finally, several of the dissent's principal arguments hinge on its view that Lucas's claims are clearly within the scope of Section 7116(b)(4) (the ULP that prohibits unions from discriminating in "the terms or conditions of membership" based on sex, disability, and other characteristics). *See* Dissenting Op. 3, 13–14, 16, 22, 25. To start, recall that the union does not so much as cite Section 7116(b)(4) in its brief. In any event, as we have explained, that provision does nothing to show that Congress sought to abandon rather than follow the norm of overlapping remedies in this context. The dissent also offers no response to our explanation that Section 7116(b)(4) may not reach discrimination by unions against bargaining-unit members who are not union members.

Most confoundingly, the dissent incorrectly assumes that Section 7116(b)(4) applies to Lucas by misreading the

complaint.  The dissent insists that Section 7116(b)(4) clearly encompasses Lucas's claims because the complaint alleges she was treated differently from "other union member[s]," which the dissent treats as an allegation that Lucas was in fact a dues-paying union member.  Compl. (No. 22-cv-777) ¶ 54; Dissenting Op. 11 n.3.  The dissent ignores that an exhibit Lucas attached to her complaint states more precisely that she was "not a dues paying [union] member" at the time relevant to her allegations.  J.A. 27; *see also N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (noting that we consider documents attached to a complaint in reviewing a Rule 12(b)(1) motion).  As the union itself acknowledged below, Lucas "only alleges that she was a bargaining unit employee"—in other words, a "member" of the bargaining unit—not "that she was a member of [the local.]" J.A. 83.  And insofar as there is any ambiguity in the complaint about what Lucas meant when she used the word "member," we must construe it in her favor.  *See N. Am. Butterfly Ass'n*, 977 F.3d at 1249.

Our statutory interpretation and rationale do not turn on whether Lucas was in fact a dues-paying union member.  But the dissent's appears to (at least when it is not arguing that the CSRA precludes any and all other causes of action without limit).  It is unclear how much of the dissent's rationale survives that basic factual misunderstanding.

\*\*\*

At bottom, our CSRA and FSLMRS precedent to date has not addressed a statute like Title VII or the ADA.  Those statutes create their own elaborate schemes to root out invidious misconduct, and specifically include labor unions within their coverage.  Congress has explicitly ensured that federal employees can bring concurrent district court and CSRA-based actions for alleged discrimination by their employers, and private employees can also bring overlapping

claims against their unions. Yet the union's position would depart from that norm of overlapping remedies and leave federal employees without the protections Congress deemed necessary to address invidious discrimination, and even to judicial review in many cases. We cannot conclude that Congress quietly upset the norm of overlapping remedies and concurrent jurisdiction for discrimination claims under Title VII and the ADA.

Accordingly, we hold that the FSLMRS does not preclude Lucas's claims under those statutes. The district court erred by dismissing them for lack of subject matter jurisdiction.

**B**

We cannot say the same of Lucas's claim under the FLSA's anti-retaliation provision, which prohibits employers from retaliating against any employee for invoking her wage-and-hour rights under the statute. *See* 29 U.S.C. § 215(a)(3). Lucas alleges that, after she filed a grievance related to her wages, the union colluded with the SBA to retaliate against her by failing to represent her properly in an arbitration proceeding. The special considerations that save her Title VII and ADA claims from the Federal Labor Relations Authority's exclusive jurisdiction do not apply to her retaliation claim. The district court thus properly dismissed her second lawsuit.

Unlike Title VII and the ADA, the FLSA is a wage-and-hour statute, not an antidiscrimination statute. Lucas has not identified any general norm of concurrent administrative and judicial jurisdiction over retaliation claims that arise in wage-and-hour disputes. Nor does the CSRA carve out retaliation claims under the FLSA for concurrent treatment. Neither Section 2302(b) nor any other provision of the CSRA provides that employees may bring such claims in the CSRA's scheme.

Additionally, unlike the antidiscrimination provisions in Title VII and the ADA, the FLSA does not expressly apply its

prohibition against retaliation to "labor organizations." The prohibition applies instead to "any person," 29 U.S.C. § 215(a)(3), which the statute defines in a general and capacious way, *id.* § 203(a). The statutory text thus does not reflect a specific congressional choice to have the FLSA's protections against retaliation encompass misconduct by labor organizations. Indeed, few cases have even held that the anti-retaliation provision creates a cause of action against unions. *See, e.g.*, *Bowe v. Judson C. Burns, Inc.*, 137 F.2d 37, 39 (3d Cir. 1943).

By contrast, a claim of sex discrimination under the FLSA in violation of 29 U.S.C. § 206(d) is specifically targeted for concurrent jurisdiction under the CSRA in Sections 2302(b) and (d), and does expressly run against "labor organization[s]." Perhaps a sex discrimination claim under the FLSA would still be viable under the logic we have set out for Title VII and the ADA, but that is not the type of FLSA claim Lucas brought.

In short, Lucas's FLSA lawsuit is clearly within the Federal Labor Relations Authority's purview because it wholly concerns the representative conduct of her union, and there is no compelling indication that Congress intended for her to also be able to bring a FLSA claim in district court. The district court correctly granted the union's motion to dismiss.

## III

The district court's judgment as to Case No. 22-cv-00777 (involving the Title VII and ADA claims) is reversed, and that case is remanded for proceedings consistent with this opinion. The district court's judgment as to Case No. 22-cv-01540 (involving the FLSA claim) is affirmed.

*So ordered.*

PAN, *Circuit Judge*, concurring in part and dissenting in part:

Nia Lucas is a former federal employee who believes that her union betrayed her. The union represented her when she filed a grievance against her employer, the Small Business Administration. Lucas alleges that during the course of that representation, the union discriminated against her because she is a woman, a mother, an African-American, and a disabled veteran.

Congress created a specialized statutory scheme for federal employees, like Lucas, who claim that their unions did not fairly represent them. Under the Civil Service Reform Act of 1978 (CSRA), Congress channeled such claims to an independent agency, the Federal Labor Relations Authority (FLRA). Lucas brought her case before the FLRA but lost. Undeterred, she turned to federal court, repackaging the same factual allegations as claims under Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act of 1990 (ADA), and the Fair Labor Standards Act (FLSA).

The question before us is not whether federal employees who suffer discrimination at the hands of their unions should get relief. Rather, this case is about the proper forum and remedies for such disputes. Congress gets to make that choice. And it put "discrimination" on a list of unlawful labor practices that must be addressed under the section of the CSRA that pertains to federal unions. Congress also designed the CSRA to be comprehensive and exclusive, as we and the Supreme Court have emphasized time and again. Thus, under longstanding precedents, a federal employee whose claims against her union fall within the CSRA's scope may not evade its statutory review scheme by coming to federal court.

Today, my colleagues in the majority veer away from the vast body of law that has strictly interpreted the exclusivity of the CSRA's statutory scheme. Relying on their understanding

that other anti-discrimination laws have broad applicability and offer more favorable remedies to plaintiffs than the CSRA, my colleagues create a new exception to the CSRA's comprehensive and exclusive regime: They hold that discrimination claims that fall under the CSRA's union-specific section may also be brought under Title VII and the ADA in federal court. I disagree. In my view, statutory text and binding precedent constrain us to hold that if a federal employee alleges misconduct by her union that appears on its face to be an unlawful labor practice under the CSRA, relief must run through the FLRA, and federal courts lack jurisdiction to hear claims based on the same conduct. I therefore respectfully dissent as to all but Part II.B of the majority opinion.[1]

## I.

### A. The CSRA and the FSLMRS

The CSRA "establishes a comprehensive scheme" that "governs federal labor-management relations." *Am. Fed'n of Gov't Emps. v. Sec'y of Air Force (AFGE I)*, 716 F.3d 633, 636 (D.C. Cir. 2013). Congress enacted it to be "an integrated scheme of administrative and judicial review, designed to balance the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *United States v. Fausto*, 484 U.S. 439, 445 (1988).

---

[1] I believe that the CSRA precludes Lucas from bringing any of the statutory claims that she filed in the district court. I therefore concur with the majority's holding in Part II.B that her FLSA claim is precluded.

Title II of the CSRA addresses adverse actions by federal agency employers against their employees. *See* 5 U.S.C. §§ 7501–7515. Title VII of the CSRA, known as the Federal Service Labor-Management Relations Statute (FSLMRS), regulates unions that represent federal employees. *See id.* §§ 7101–7135.

The FSLMRS defines and forbids unfair labor practices (ULPs) by any "labor organization" "composed in whole or in part of [federal] employees." 5 U.S.C. § 7103(a)(4). The list of forbidden ULPs expressly addresses discrimination by a union against a federal employee. In relevant part, the statute provides:

> (b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization —
>
> > (4) to discriminate against an employee with regard to the terms or conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition[.]

*Id.* § 7116(b)(4). In addition, section 7114(a)(1) states that "[a] labor organization which has been accorded exclusive recognition is . . . responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership."

Relying on the foregoing statutory provisions, the Supreme Court has held that it is also a ULP for a union to

"breach . . . the duty of fair representation." *Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263*, 489 U.S. 527, 532 (1989). That duty requires a federal union to "represent[] the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership." *Id.* at 531 (quoting 5 U.S.C. § 7114(a)(1)). It also "generally requires the union to serve the interests of all bargaining unit employees without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Jacoby v. NLRB*, 325 F.3d 301, 309 (D.C. Cir. 2003). In certain circumstances, a union's "failure to seek arbitration (which an employee may not compel on his own) may constitute . . . a breach" of the duty of fair representation. *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 966 (D.C. Cir. 1990).

To address ULP claims, the CSRA "establishes a scheme of administrative and judicial review." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump (AFGE II)*, 929 F.3d 748, 752 (D.C. Cir. 2019). Disputes under the CSRA are adjudicated by the FLRA, an independent administrative agency. *Id.* (citing 5 U.S.C. § 7105(a)); *see also* 5 U.S.C. § 7118(a)(1). If the FLRA finds that a ULP occurred, it may issue a cease-and-desist order, require reinstatement with backpay, or mandate "such other action as will carry out the purpose of this chapter." *See* 5 U.S.C. § 7118(a)(7).

To charge a union with a ULP, a party must file the charge with the Regional Director of the FLRA. 5 C.F.R. § 2423.6(a). After conducting an investigation, *id.* § 2423.8(a), the Regional Director may either (1) issue a complaint and refer the case to an administrative law judge, or (2) dismiss the charge, *id.* § 2423.10(a). A dismissal may be appealed to FLRA's General Counsel. *Id.* § 2423.11(c). The CSRA provides for judicial review of "any final order of" the FLRA. 5 U.S.C. § 7123(a).

But if the General Counsel declines to issue a complaint after reviewing the Regional Director's decision, that is not a final order and is not judicially reviewable. *Turgeon v. FLRA*, 677 F.2d 937, 939 (D.C. Cir. 1982).

Both the Supreme Court and our court have developed a vast body of law interpreting the CSRA. "As our Court has emphasized, the CSRA is comprehensive and exclusive." *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009) (Kavanaugh, J.). The statute "regulates virtually every aspect of federal employment and 'prescribes in great detail the protections and remedies' applicable to adverse personnel actions, 'including the availability of administrative and judicial review.'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 448 (D.C. Cir. 2009) (Kavanaugh, J.) (quoting *Fausto*, 484 U.S. at 443).

The broad scope of the overall regulatory regime holds true for the FSLMRS, the section that deals with federal unions: "With the FSLMRS, as with all of the CSRA: 'Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector, including the authorization of collective bargaining.'" *AFGE I*, 716 F.3d at 636 (quoting *Steadman*, 918 F.2d at 967). The comprehensiveness of this scheme advances "[t]he purpose of the CSRA," which was "designed to replace an outdated patchwork of statutes and rules that afforded employees the right to challenge employing agency actions in district courts across the country." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 13–14 (2012) (cleaned up). By making the CSRA an exclusive source of remedies available for federal employees, Congress avoided the "wide variations in the kinds of decisions issued on the same or similar matters [under the prior regime] and a double layer of judicial review that was wasteful and irrational." *Id.* at 14 (cleaned up).

6

"Congress designed the CSRA's remedial scheme with care, 'intentionally providing — and intentionally not providing — particular forums and procedures for particular kinds of claims.'" *Grosdidier*, 560 F.3d at 497 (quoting *Filebark v. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009)). "[T]he 'failure to include' any relief 'within the remedial scheme of so comprehensive a piece of legislation reflects a congressional intent that no judicial relief be available.'" *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.) (quoting *Carducci v. Regan*, 714 F.2d 171, 174 (D.C. Cir. 1983)). In other words, a plaintiff whose claim falls within the CSRA's scope "must rely on the 'variety of causes of action and remedies' created by the CSRA." *AFGE I*, 716 F.3d at 636 (quoting *Grosdidier*, 560 F.3d at 497). That is so "[e]ven if the plaintiff 'cannot prevail in a claim under the CSRA,' [and] no other relief is available." *Id.* (quoting *Grosdidier*, 560 F.3d at 497). To sum up, "so far as review of determinations under the CSRA is concerned, what you get under the CSRA is what you get." *Fornaro*, 416 F.3d at 67. Indeed, "[w]hen Congress wants to preserve remedies outside the CSRA, it does so expressly." *Nyunt*, 589 F.3d at 448.

"'It follows, then, that federal employees may not circumvent [the CSRA's] structure' by seeking judicial review outside the CSRA's procedures." *AFGE I*, 716 F.3d at 636 (quoting *Steadman*, 918 F.2d at 967). In other words, a plaintiff may not "circumvent" and "end-run" the CSRA by bringing claims under other statutes. *Grosdidier*, 560 F.3d at 497. Our cases "establish that the CSRA is the exclusive remedy for aggrieved federal employees advancing nonconstitutional claims." *Spagnola v. Mathis (Spagnola I)*, 809 F.2d 16, 30 (D.C. Cir. 1986); *see also Spagnola v. Mathis (Spagnola II)*, 859 F.2d 223, 224 (D.C. Cir. 1988) (en banc) (on rehearing *en banc*, holding that the CSRA precludes

constitutional *Bivens* actions as well). Consistent with that principle, we and the Supreme Court have held that the CSRA precludes federal-court jurisdiction over a wide variety of claims if they are based on facts within the CSRA's scope. *See Spagnola I*, 809 F.2d at 28 (workplace retaliation claim under 42 U.S.C. § 1985(1)); *Spagnola II*, 859 F.2d at 224 (*Bivens* claim); *Fausto*, 484 U.S. at 455 (Back Pay Act claim); *Carducci*, 714 F.2d at 175 (APA claim); *Graham v. Ashcroft*, 358 F.3d 931, 935 (D.C. Cir. 2004) (*Vitarelli* claim that agency violated own regulations).

## B. Factual and Procedural History

Lucas is an African-American woman, a mother, and a U.S. Army veteran, with a disability stemming from a traumatic brain injury that she suffered while in the military. From January 2017 until April 2020, she worked as a program analyst for the Small Business Administration (SBA). The local chapter (Local) of the American Federation of Government Employees (AFGE) was the exclusive representative of her bargaining unit.

As the majority explains, Lucas's claims arise out of alleged discrimination by AFGE, the Local, and two union officials — Johnnie Green and Michael Kelly — in connection with the union's representation of Lucas in a dispute with the SBA. *See* Maj. Op. 6–9. Briefly put, Green, the Local's president, filed a grievance on Lucas's behalf and invoked arbitration, but he did not include all the charges that Lucas thought should be included, and Lucas had to pay the arbitration fee and attorney's fee. While representing Lucas, Green allegedly sexually harassed her. When she complained, defendants allegedly retaliated by assigning an inexperienced union steward to represent her, postponing and then withdrawing her arbitration, and expelling her from the union.

Initially, Lucas sought relief by filing three ULP charges with the FLRA. In her first charge, she alleged that AFGE violated its duty of fair representation through "continuous postponement of the arbitration hearing"; and she "included her claims for [the] sexual harassment she endured from Johnnie Green." Title VII/ADA Compl. ¶¶ 62–63. In her second charge, also against AFGE, she alleged that Kelly and Green collaborated "in the restriction of [her] union rights and expelling [her] from the union." J.A. 98. She also alleged that Kelly "sought to support the discrimination [she] experienced as [a] result of [her] sex, . . . and inhibit[ed] the negotiation with the [SBA by] failing to follow both the law and AFGE constitution." J.A. 98. Finally, in her third charge, against the Local, she claimed that Green threatened her with the loss of her settlement agreement with the SBA if she did not "support the union activities" and sexually harassed her, resulting in discrimination. J.A. 104. She further stated that the union expelled her "for filing an unfair labor practice with FLRA, [and] for participating in [the] Board investigation"; and that "because of her criticism of . . . Green," it withdrew her arbitration and "interfere[d] [with] and restrict[ed] her right[s] under" the FSLMRS. J.A. 104.

Lucas's efforts were unsuccessful. The FLRA issued two letters dismissing as untimely her first two ULP charges. The fate of her third ULP charge is unclear from the record. Because the FLRA has been without a General Counsel since 2017, Lucas effectively has been unable to pursue any appeals.

Stymied by the FLRA, Lucas turned to the federal district court, bringing one case under Title VII and the ADA, and another under the FLSA. In her Title VII/ADA Complaint, she alleged that AFGE and the Local (1) discriminated against her on the basis of her sex, in violation of Title VII; (2)

discriminated against her on the basis of her disability, in violation of the ADA; (3) created and allowed a hostile work environment, in violation of both statutes; and (4) retaliated against her when she engaged in various protected activities, in violation of both statutes.[2]  In her FLSA Complaint, Lucas alleged in relevant part that AFGE, the Local, Green, and Kelly retaliated against her after she filed an employee grievance, in violation of the FLSA.  FLSA Compl. ¶¶ 62–78.

Defendants moved to dismiss both cases for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  The district court observed that Lucas "filed multiple unfair labor practices with the FLRA against AFGE and the Local complaining about the very same facts and circumstances she has now put before the Court" in the Title VII/ADA Case.  *Lucas v. Am. Fed'n of Gov't Emps.*, No. 22-cv-0777, 2023 WL 2682175, at *9 (D.D.C. Mar. 29, 2023).  It noted that "[i]n each of the ULPs, plaintiff specifically asserted that the conduct now underlying her claims under [Title VII] and the ADA contravened the CSRA's prohibition against unfair labor practices."  *Id*.  The district court concluded that "[h]er allegations, therefore, are properly characterized as a mere repackaging of her claims under the CSRA for breach of the duty of fair representation."  *Id*.  The district court likewise

---

[2]  The facts underlying the Title VII and ADA claims included allegations that defendants (1) failed to represent Lucas with respect to her 2017 grievances; (2) failed to file a ULP charge for that failure to represent her; (3) made Lucas pay the arbitration fee and attorney's fee for her arbitration; (4) assigned an inexperienced union steward to represent her; (5) forced her "to endure a hostile work environment in order to continue with the arbitration"; (6) postponed and ultimately withdrew her arbitration; (7) expelled her from the union; and (8) told Lucas that the union "did not want to represent disabled mothers of newborns."  *See* Title VII/ADA Compl. ¶¶ 27–30, 52, 62, 80–85, 95, 107–08, 115–16.

determined that Lucas's FLSA Complaint "cannot be construed to be about anything other than the breach of the duty of fair representation" since "[a]ll of these allegations also underlie the claims in the ULPs she submitted to the FLRA." *Id.* at \*10. Accordingly, the district court found that the CSRA precluded jurisdiction over Lucas's claims and granted the motions to dismiss. *Id.* at \*12. Lucas filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II.

As a threshold matter, Lucas's claims are within the scope of the CSRA because her allegations support a claim that the union committed a ULP by violating its duty of fair representation. The district court carefully compared the facts alleged in Lucas's district court complaints with those that supported her ULP charges before the FLRA: It determined that Lucas's Title VII, ADA, and FLSA claims rely on the "very same facts and circumstances" as the ULP claims. *Lucas*, 2023 WL 2682175, at \*9. Lucas has not challenged that conclusion. Thus, we must accept that each of the instances of discrimination alleged in the complaints is also a breach of the duty of fair representation, which required AFGE to "represent[] the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership." *Karahalios*, 489 U.S. at 531 (quoting 5 U.S.C. § 7114(a)(1)).[3]

Against that backdrop, our task is to answer the following question: Did Congress intend to allow federal employees with

---

[3]     Although the majority suggests, without elaboration, that a fair-representation ULP may have been unavailable to Lucas, Maj. Op. 15–16, Lucas herself alleged before the FLRA that defendants

11

ULP claims under the FSLMRS to bring other claims based on the same facts under different statutes? In my view, the CSRA's text, binding precedent, and the *Thunder Basin* framework all point to Congress's intent to keep such claims within the exclusive purview of the CSRA. Because Lucas's

---

violated the duty of fair representation, and she has maintained that position throughout the pendency of this case. In any event, even if we assume that Lucas could not make a fair-representation claim, she also asserted before the FLRA that the union committed a different ULP by "discriminat[ing] against an employee with regard to the terms or conditions of membership in the labor organization on the basis of" a protected characteristic. *See* 5 U.S.C. § 7116(b)(4). The majority disregards this ULP on the ground that Lucas was not actually a union member. Maj. Op. 16. But Lucas alleged before the district court that she was a "member" of the union, Title VII/ADA Compl. ¶ 54, and a "union steward," FLSA Compl. ¶ 14, until she was "expelled," Title VII/ADA Compl. ¶ 65, and "discharged" from the union in retaliation for her protected activity, FLSA Compl. ¶¶ 16, 38, 53, 94. Because we are "[a]t the motion-to-dismiss stage, we accept the factual allegations in Lucas's complaints as true." Maj. Op. 6 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The majority nonetheless relies on representations by Lucas's counsel at oral argument, based on "my conversation with my client, which I appreciate is not part of the record." Oral Arg. Tr. 24. The majority also relies on a quote taken out of context from an exhibit attached to Lucas's complaint. In that exhibit, Lucas sent an email cataloguing her complaints against union leader Johnnie Green. Lucas wrote, among other things, that Green removed her as a "national steward" of the union and that Green asserted that Lucas "was not a dues paying member" of the union. J.A. 27. The majority takes the latter statement as definitive proof that Lucas was not a union member. But Green's statement to that effect in that context does nothing to negate Lucas's repeated allegations that she was a union member, especially considering Lucas's simultaneous assertion that Green fired her as a union steward. The bottom line is that Lucas's claims before the district court unquestionably fall within the scope of the CSRA.

allegations establish that the union breached its duty of fair representation, her only remedy is to pursue claims under the CSRA before the FLRA. The district court therefore correctly dismissed both her complaints for lack of jurisdiction.

My colleagues in the majority arrive at a different conclusion based on "special considerations" for Title VII and the ADA. Maj. Op. 32. They go wrong by departing from the traditional tools of statutory interpretation. Their holding that Lucas may bring her Title VII and ADA claims is contrary to the CSRA's text and comprehensive scheme. Moreover, binding precedents foreclose their reasoning and their holding. But they rely on the generally broad reach of Title VII and the ADA to get to their preferred outcome, instead of focusing on the specific, anti-discrimination provisions of the CSRA. *See Spagnola I*, 809 F.2d at 30 (in evaluating the exclusivity of the CSRA, we apply the familiar "principle . . . that a precisely drawn, detailed statute preempts more general remedies" (cleaned up)); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 815 (2024) (a court may not "disregard[]" a statute's "text" "in favor of alleged congressional intent divined from *other* statutes with very different language" (emphasis in original)).

The majority also is mistaken when it cites the supposed inadequacy of the remedies available for anti-discrimination claims under the CSRA. *See AFGE I*, 716 F.3d at 638 ("[I]t is the comprehensiveness of the [CSRA], not the adequacy of specific remedies thereunder, that counsels judicial abstention." (cleaned up)); *see also Fornaro*, 416 F.3d at 67 ("What you get under the CSRA is what you get." (cleaned up)). And finally, the majority unwisely wonders why Congress would preclude federal employees from benefiting from statutory remedies that are generally available to others. *See Badgerow v. Walters*, 596 U.S. 1, 16–17 (2022) ("However

the pros and cons shake out, Congress has made its call."). Because I disagree with the majority's unconventional methods of statutory interpretation, I respectfully dissent.

## A. Statutory Text

"In addressing a question of statutory interpretation, we begin with the text." *City of Clarksville v. FERC*, 888 F.3d 477, 482 (D.C. Cir. 2018). Here, the CSRA's text indicates that Congress did not intend to allow a federal employee to bring a claim against her union in federal court if the facts underlying her claim fall within the scope of the CSRA.

Congress explicitly placed discrimination claims within the purview of the CSRA, providing that discrimination is both a prohibited personnel practice by an employer, 5 U.S.C. § 2302(b)(1), and a ULP by a union, *id.* §§ 7114(a)(1), 7116(b)(4), (8). But the CSRA treats such claims differently when they involve an employer: The statute expressly allows a federal employee to also bring discrimination claims under Title VII and other anti-discrimination statutes against *federal employers*. *See id.* § 2302(d). It contains no parallel saving clause to permit free-standing discrimination claims against federal *unions*.

That is so even though the two CSRA provisions that reference discrimination claims are functionally identical. In relevant part, section 2302(b)(1) makes it a prohibited personnel practice for an employer to discriminate in personnel actions against employees "on the basis of race, color, religion, sex, or national origin, as prohibited under section 717 of the Civil Rights Act of 1964" or "on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973," 5 U.S.C. § 2302(b)(1)(A), (D); while section 7116(b)(4) makes it a ULP for a union "to discriminate against

an employee with regard to the terms or conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition," *id.* § 7116(b)(4).

With respect to claims against employers, the saving clause in section 2302(d) preserves other statutory remedies, providing that "[t]his section shall not be construed to extinguish or lessen . . . any right or remedy available to any employee or applicant for employment in the civil service under . . . section 717 of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, religion, sex, or national origin" or "section 501 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicapping condition." 5 U.S.C. § 2302(d)(1), (4).

In a glaring omission, however, the CSRA contains no similar saving clause for discrimination claims against unions. The logical inference we should draw from that disparity is that Congress knew how to preserve federal-court jurisdiction over discrimination claims brought by federal employees, but it chose not to do so for discrimination claims against unions.

Indeed, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *NetCoalition v. SEC*, 715 F.3d 342, 350 (D.C. Cir. 2013) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)); *see also* Antonin Scalia & Bryan A. Garner, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107 (2012) ("The expression of one thing implies the exclusion of others . . . ."). The Supreme Court has "invoked this [*expressio unius*] canon time and time again." *City & Cnty. of San Francisco v. EPA*,

145 S. Ct. 704, 714 (2025). Thus, the absence of an explicit provision that preserves the right of federal employees to bring suits against their unions under Title VII and the ADA is strong evidence that Congress did not intend to allow such suits to proceed. And that inference is reinforced by our specific CSRA precedents. We have explained that "[w]hen Congress wants to preserve remedies outside the CSRA, it does so expressly." *Nyunt*, 589 F.3d at 448 (citing 5 U.S.C. § 2302(d) and *Grosdidier*, 560 F.3d at 497 n.2).

With no express preservation of outside remedies, Congress placed "discrimination" on the list of ULPs in the FSLMRS, thereby demonstrating its intent to channel discrimination claims, like all ULPs, to the FLRA, and not to a federal court. *See Steadman*, 918 F.2d at 966 (noting that *Karahalios* "bars a district court from entertaining an unfair labor practice claim, over which the FLRA has exclusive jurisdiction"). The text of the statute thus strongly supports the conclusion that the CSRA precludes parallel actions under Title VII and the ADA.

Although the *expressio unius* principle may be overcome by contrary indications of congressional intent, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 381 (2013), my colleagues have not offered any other "plausible explanation" for Congress's pointed omission of a saving clause for discrimination cases against unions, *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 211 (D.C. Cir. 2013) (cleaned up). I am unconvinced by my colleagues' contention that it was necessary for Congress to include a saving clause for claims against agencies but not against unions because the provision that defines prohibited personnel practices for agencies refers to "Title VII and other specific statutes by name," thereby creating the need to dispel an "obvious implication that Congress intended to funnel those statutory claims exclusively through the CSRA

scheme." Maj. Op. 18. My colleagues overstate the significance of this difference. Although the FSLMRS does not expressly reference Title VII or other statutes, it broadly covers discrimination "on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition." 5 U.S.C. § 7116(b)(4). It makes such discrimination a ULP and places ULPs within the exclusive jurisdiction of the FLRA. *See id.* §§ 7105(a)(2)(G), 7118. Thus, the wording of the FSLMRS provision also comes with "the obvious implication that Congress intended to funnel [the listed] claims exclusively through the CSRA scheme." Maj. Op. 18. Yet Congress did not expressly preserve remedies outside the CSRA, even though it easily could have done so with a saving clause like the one in section 2302(d). *See Nyunt*, 589 F.3d at 448 ("When Congress wants to preserve remedies outside the CSRA, it does so expressly . . . .").

Ultimately, we should presume that the legislature meant what it said: "Congress designed the CSRA's remedial scheme with care, 'intentionally providing — and intentionally not providing — particular forums and procedures for particular kinds of claims.'" *Grosdidier*, 560 F.3d at 497 (quoting *Filebark*, 555 F.3d at 1010). In my view, Congress has deliberately declined to preserve the ability of federal employees to file claims against their unions in federal court when the alleged misconduct can instead be resolved before the FLRA under the CSRA. We must respect that choice.

## B. Precedent

Binding precedent buttresses my interpretation of the statutory text and independently requires us to hold that the CSRA precludes Lucas from bringing claims under Title VII and the ADA.

1.  *Karahalios* and *Steadman*

*Karahalios* is the Supreme Court's leading decision on the FSLMRS, and our court's decision in *Steadman* builds on the analysis in *Karahalios*.  *See Karahalios*, 489 U.S. at 529; *Steadman*, 918 F.2d at 966.  Together, those cases stand for the general proposition that plaintiffs may not seek recourse in federal court simply by framing their ULP claims under the CSRA as claims under other statutes.

In *Karahalios*, the Court addressed whether there is an implied cause of action to enforce a federal union's duty of fair representation in federal court.  The Court evaluated the text, structure, and legislative history of the CSRA and the FSLMRS and concluded that Congress did not "intend[] to furnish a parallel remedy in a federal district court to enforce the duty of fair representation."  489 U.S. at 532; *see also id.* at 536.  Although the Court did not directly address whether a district court has jurisdiction when a plaintiff relies on facts underlying a fair representation claim to assert a cause of action under another statute, it closely examined Congress's intent to permit parallel remedies.  In so doing, the Court noted that "[t]o hold that the district courts must entertain such cases in the first instance would seriously undermine what we deem to be the congressional scheme, namely to leave the enforcement of union and agency duties under the [CSRA] to the General Counsel and the FLRA and to confine the courts to the role given them under the [CSRA]."  *Id.* at 536–37.  Thus, under *Karahalios*, "the FLRA enjoys exclusive jurisdiction over a claim of a union's breach of its duty of fair representation." *Steadman*, 918 F.2d at 966 (citing *Karahalios*, 489 U.S. at 533–34).

Applying *Karahalios* in *Steadman,* we rejected an attempt by federal employees to evade the FSLMRS by repackaging

what were essentially fair representation claims against their unions. *See Steadman*, 918 F.2d 963. The plaintiffs had sued their union, alleging that after they were fired, their union failed to effectively invoke arbitration on their behalf. Although the employees asserted due process and other claims, we noted that "the union's mishandling of the employees' claims on its face appears to be a breach of the union's duty of fair representation, under 5 U.S.C. § 7114(a)(1), which *is* actionable as an unfair labor practice pursuant to 5 U.S.C. § 7116(b)(8)." *Id.* at 966 (emphasis in original). Accordingly, we held that the district court lacked jurisdiction over the employees' claims. *Id.* at 967–68. We explained that a plaintiff could not pursue a claim that "on its face appears to be a breach of the [federal] union's duty of fair representation" simply through "clever drafting of a complaint." *Id.* at 966–67.

As in *Steadman*, Lucas purports to bring claims under statutes other than the CSRA even though the union's alleged misconduct "on its face appears to be a breach of the union's duty of fair representation." *Steadman*, 918 F.2d at 966. But she may not evade the CSRA through artful pleading.[4] Because Lucas's claims "fall within [CSRA's] scope," that statute "provides 'the exclusive avenue for suit.'" *AFGE I*, 716 F.3d at 636 (quoting *Grosdidier*, 560 F.3d at 497). She "must rely on the 'variety of causes of action and remedies' created by the CSRA" and "'may not circumvent the Act's

---

[4] To be sure, unlike the *Steadman* plaintiffs, Lucas first pursued her remedies under the CSRA. But *Steadman* stated that the plaintiffs could have come to federal court had they exhausted their CSRA remedies only because they advanced intertwined statutory and constitutional claims. *Steadman*, 918 F.2d at 967–68 (citing *Andrade v. Lauer*, 729 F.2d 1475, 1493 (D.C. Cir. 1984) and *Griffith v. FLRA*, 842 F.2d 487 (D.C. Cir. 1988)). Since Lucas brings only statutory claims, exhaustion does not unlock the courthouse door.

requirements and limitations by resorting to'" Title VII or the ADA. *See id.* (quoting *Grosdidier*, 560 F.3d at 497).

2. *Spagnola I*

As discussed, the federal reporters brim with cases that treat the CSRA as comprehensive and exclusive. *See* Part I.A. But the most directly on-point decision in our jurisdiction is *Spagnola I*, which forecloses any argument that federal employees have statutory remedies outside the CSRA for discrimination by their unions.

In *Spagnola I*, a federal employee who allegedly suffered harassment and retaliation by his superiors asserted a claim against his employer under 42 U.S.C. § 1985(1). *See* 809 F.2d at 28. That provision "proscribes conspiracies that, by means of force, intimidation, or threats, prevent federal officers from discharging their duties or accepting or holding office." *Thompson v. Trump*, 590 F. Supp. 3d 46, 62 (D.D.C. 2022), *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023).

We accepted that section 1985(1) protects federal employees' rights to be free of retaliation in the workplace — just like Title VII and the ADA. *Spagnola I*, 809 F.2d at 28–29. But we held that "Congress meant the CSRA to be the exclusive statutory remedy for aggrieved federal employees and thereby foreclosed [plaintiff's] resort to § 1985(1)." *Id.* at 28. Indeed, we noted that the "unifying thread" of our CSRA cases was "that the CSRA precludes resort to other statutory schemes for aggrieved federal employees raising nonconstitutional claims against their employers." *Id.* at 30. In reaching that conclusion, we noted that "[t]here is no requirement that Congress' alternative remedy be 'adequate' or that Congress afford a certain kind of tribunal for claims that

do not arise under the Constitution," because "Congress can create and modify nonconstitutional claims as it sees fit; the role of the courts is simply to divine congressional intent." *Id.* at 28. Here, Lucas's claims under Title VII and the ADA are barred by a straightforward application of *Spagnola I*'s holding that "the CSRA is the exclusive remedy for aggrieved federal employees advancing nonconstitutional claims." *Id.* at 30.

Although *Spagnola I* could not be clearer, the majority points out that we have not rested our later decisions on the broad language from that case. *See* Maj. Op. 23 n.8. But that makes little difference because we are "bound to follow circuit precedent until it is overruled either by an *en banc* court or the Supreme Court." *Maxwell v. Snow*, 409 F.3d 354, 358 (D.C. Cir. 2005). To the extent there is any conflict with later cases, *Spagnola I* controls as the earlier precedent. *See Rosenkrantz v. Inter-Am. Dev. Bank*, 35 F.4th 854, 868 (D.C. Cir. 2022). In any event, our later cases are consistent with the general rule announced in *Spagnola I*, as its strict approach to preclusion remains central to our CSRA jurisprudence: "What you get under the CSRA is what you get." *Fornaro*, 416 F.3d at 67 (cleaned up).

Even setting aside *Spagnola I*'s broad holding precluding all statutory claims, the case's narrower holding also controls. In *Spagnola I*, we held that the CSRA precluded a federal employee with a claim under the CSRA from pursuing a workplace retaliation claim under another statute, section 1985(1), that serves to "root out invidious misconduct." Maj. Op. 31. In my view, *Spagnola I* forecloses the majority's jurisdictional carve-out and requires us to affirm the dismissal of Lucas's claims.

### 3. The "General" "Catchall Statute" Argument

Confronted with our "CSRA and FSLMRS precedent," which "describ[es] the statutes' preclusive force in broad terms," Maj. Op. 20–21, my colleagues attempt to find a distinguishing feature to save Lucas's claims. They argue that our precedents that highlight the CSRA's "preclusive force" have "generally" been limited to "a certain kind of federal statute: 'general,' 'catchall' statutes that could cover 'a vast number of cases' that Congress intended to funnel through the CSRA's process of administrative review instead of through district courts." Maj. Op. 21 (quoting *Lacson v. DHS*, 726 F.3d 170, 176 (D.C. Cir. 2013)). But the majority's reasoning falls short because Title VII and the ADA are precisely the sort of "general" statutes that we have found precluded by the CSRA.

In harmonizing the CSRA with other statutes, "[w]e are guided by the 'old and familiar rule' that 'the specific governs the general,' which is 'particularly true' where 'Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions.'" *Patten v. District of Columbia*, 9 F.4th 921, 926 (D.C. Cir. 2021) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012)). Accordingly, in *Spagnola I* we recognized that our CSRA preclusion cases "seem to be applications of the general principle . . . that 'a precisely drawn, detailed statute preempts more general remedies.'" 809 F.2d at 30 (quoting *Brown*, 425 U.S. at 834). Applying that principle in *Patten*, 9 F.4th at 926, we held that a statute establishing a special statutory review framework precluded resort to the ADA and other generally applicable antidiscrimination statutes — notwithstanding the supposed "norm of concurrent, overlapping remedies for discrimination." Maj. Op. 13.

Here, the FSLMRS specifically addresses discrimination against a federal employee by any "labor organization" "composed in whole or in part of [federal] employees." 5 U.S.C. § 7103(a)(4). In a precisely drawn provision, the statute forbids that kind of discrimination on the basis of "race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition." *Id.* § 7116(b)(4). Title VII and the ADA are statutes of broader and more general applicability than the CSRA.[5] They permit plaintiffs to sue in a wide variety of circumstances, and the majority concedes that they sweep more broadly than the FSLMRS "in terms of substantive coverage." *See* Maj. Op. 15 ("Lucas and the EEOC (as amicus) make a substantial case that the FSLMRS provisions are . . . narrower [than Title VII and the ADA] in terms of substantive coverage."). Thus, the CSRA's comprehensive scheme, which deliberately targets the specific problem of discrimination by federal-employee unions, preempts the more general prohibitions against discrimination in Title VII and the ADA.

The majority's heavy reliance on *Lacson v. Department of Homeland Security*, 726 F.3d 170, is misplaced. In my view, *Lacson* is entirely consistent with our broader CSRA

---

[5] *See* 42 U.S.C. § 2000e-2(a)–(c) (prohibiting discrimination on the basis of "race, color, religion, sex, or national origin" by employers, employment agencies, and unions); *id.* § 2000e-16(a) (providing that personnel actions affecting federal employees "shall be made free from any discrimination based on race, color, religion, sex, or national origin"); *id.* § 12112(a) (prohibiting discrimination "on the basis of disability" by any "covered entity"); *id.* § 12111(2) (defining "covered entity" to include employers, employment agencies, and unions).

jurisprudence and does not support the majority's unprecedented carveout for discrimination claims.

In *Lacson*, an air marshal who had been fired for leaking sensitive security information sought review of the TSA order that justified his firing. *See* 726 F.3d at 172. He sought review in federal court under 49 U.S.C. § 46110, which expressly grants federal courts jurisdiction to review that specific type of TSA order. *Id.* at 173 (citing 49 U.S.C. §§ 46110, 114(r)). We recognized that Lacson's suit "ha[d] much in common" with lawsuits that we had deemed precluded by the CSRA. *Id.* at 175. But we distinguished those precedents because we found "something special about § 46110's grant of jurisdiction." *Id.* at 176. The prior cases precluding non-CSRA claims "involved attempts to use quite general statutory review provisions to reach other federal courts," whereas section 46110 "specifically addresses the type of order at issue here." *Id.* We explained that "because the statute is so narrowly drawn, we need not worry that hearing Lacson's case would permit employees to circumvent the CSRA's requirements and limitations in a vast number of cases that would otherwise go to the MSPB," the independent agency that adjudicates prohibited personnel actions by employers under the CSRA. *Id.* (cleaned up).

This case is nothing like *Lacson* because Title VII and the ADA are not "narrowly drawn." 726 F.3d at 176. The CSRA precludes claims under Title VII and the ADA because those statutes are more general than the CSRA. By misapplying that basic principle and greenlighting parallel suits under Title VII and the ADA, the majority "permits employees to circumvent the CSRA's requirements and limitations" in a potentially "vast number of cases that would otherwise go to" the FLRA — and

that plainly contravenes our reasoning in *Lacson*. *See id.* (cleaned up).[6]

In sum, Title VII and the ADA provide remedies that are more general than those available under the FSLMRS, and "the specific governs the general." *Patten*, 9 F.4th at 926 (cleaned up). Because Lucas's claims fall within the scope of the FSLMRS, she may not bring claims under Title VII and the ADA in federal court.

## D. *Thunder Basin*

The *Thunder Basin* framework provides further confirmation that the CSRA precludes parallel claims under Title VII and the ADA. *Thunder Basin* is a tool for discerning congressional intent when evaluating the exclusivity of a statutory review scheme. *See Axon Enter. v. FTC*, 598 U.S. 175, 186 (2023) ("The ultimate question is how best to understand what Congress has done — whether the statutory review scheme, though exclusive where it applies, reaches the claim in question."). "Under that framework, Congress intended that a litigant proceed exclusively through a statutory scheme when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory

---

[6] Moreover, the majority's attempt to limit the CSRA's preclusive effect to "catchall" statutes like the APA is inconsistent with precedent. We have held that the CSRA precluded resort to section 1985(1), which covers conspiracies against federal officials that extend beyond the federal employment context. *See id.* Yet section 1985(1) is plainly not a "catchall" statute that "could cover 'a vast number of cases' that Congress intended to funnel through the CSRA's process of administrative review instead of through district courts." Maj. Op. 21 (quoting *Lacson*, 726 F.3d at 176).

structure.'" *AFGE II*, 929 F.3d at 754 (cleaned up) (quoting *Thunder Basin*, 510 U.S. at 207, 212).[7]

Under step one of the *Thunder Basin* test, Congress unquestionably intended the CSRA to be comprehensive and exclusive. *See supra* Parts II.A, II.B. As we have explained:

> With the FSLMRS, as with all of the CSRA: Congress passed an enormously complicated and subtle scheme to govern employee relations in the federal sector. . . . Thus, we can fairly discern that Congress intended the statutory scheme to be exclusive with respect to claims within its scope.

*AFGE II*, 929 F.3d at 755 (cleaned up).

Step two of *Thunder Basin* also is satisfied: The district court made an uncontested finding that Lucas's discrimination claims under Title VII and the ADA also were ULPs that are reviewable within the CSRA's statutory structure. As discussed, Congress expressly included discrimination claims as ULPs subject to adjudication by the FLRA. *See* 5 U.S.C. §§ 7114(a)(1), 7116(b)(4). And the statutory text and precedent strongly indicate that Lucas's claims must be brought through the CSRA's scheme. *See supra* Parts II.A, II.B.

---

[7] The majority doubts that *Thunder Basin* applies to this case, suggesting that this "framework is typically applied to determine where a claim should first be brought," rather than whether "a statutory review scheme completely extinguishes a plaintiff's rights under another federal statute." Maj. Op. 25–26. But the majority cites no authority that limits *Thunder Basin* in that way.

My colleagues in the majority dispute that step two of the *Thunder Basin* framework favors defendants. They note that when courts apply step two, they may consider whether: "(1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claims are wholly collateral to the statutory review provisions; and (3) the claims are beyond the expertise of the agency." *AFGE II*, 929 F.3d at 755 (cleaned up). The majority contends that the first of these factors "is all but dispositive here" because a failure to bring a complaint by the FLRA's General Counsel is not judicially reviewable. Maj. Op. 26.

But that misunderstands the *Thunder Basin* inquiry. The limited scope of judicial review cannot be "dispositive" evidence of Congress's intent regarding the CSRA's exclusivity. The three listed "considerations . . . serve as general guideposts useful for channeling the inquiry into whether the particular claims at issue fall outside an overarching congressional design." *AFGE II*, 929 F.3d at 755 (cleaned up). Even "when the answer to all three questions is yes," that just means that a court will "*presume* that Congress does not intend to limit jurisdiction." *Axon Enter.*, 598 U.S. at 186 (cleaned up) (emphasis added). "The ultimate question is how best to understand what Congress has done — whether the statutory review scheme, though exclusive where it applies, reaches the claim in question." *Id.* For all the reasons previously discussed, discrimination claims premised on conduct that would support ULP claims under the CSRA plainly are "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212.

Accordingly, the *Thunder Basin* framework confirms that the district court lacked jurisdiction over Lucas's Title VII and ADA claims.

### E.  Congressional Intent

The majority opinion advances the overarching view that it is "implausible" that Congress meant to relegate discrimination claims against federal unions to an inferior status by channeling them exclusively through the CSRA.  Maj. Op. 10.  I cannot agree.  The majority appears to make an incorrect assumption that the legislative intent behind the CSRA is to expand protections for federal workers, despite contrary signals from Congress.

First, "[t]he best evidence of [congressional] purpose is the statutory text adopted by both Houses of Congress and submitted to the President."  *W. Va. Univ. Hosps. v. Casey*, 499 U.S. 83, 98 (1991).  "[T]he text of a law controls over purported legislative intentions unmoored from any statutory text" and a court "may not replace the actual text with speculation as to Congress' intent."  *Corner Post*, 603 U.S. at 815 (cleaned up).  For the reasons previously discussed, I believe that the CSRA's text strongly favors preclusion of Title VII and ADA claims.  *See supra* Part II.A.

Second, the majority effectively imposes a clear statement rule to constrain Congress's ability to pare back discrimination protections in the federal labor context.  *See* Maj. Op. 32 ("We cannot conclude that Congress quietly upset the norm of overlapping remedies and concurrent jurisdiction for discrimination claims under Title VII and the ADA.").  But the majority opinion gets things backwards:  It is far more unlikely that Congress quietly opened a discrimination-claim loophole in the CSRA's otherwise "comprehensive and exclusive" scheme.  *Grosdidier*, 560 F.3d at 497.  Contrary to the majority's assumption, parallel remedies are presumptively precluded by the CSRA, not permitted.  *See Nyunt*, 589 F.3d at 448 ("When Congress wants to preserve remedies outside the

CSRA, it does so expressly."); *see also AFGE II*, 929 F.3d at 755 ("[W]e can fairly discern that Congress intended the [CSRA] statutory scheme to be exclusive with respect to claims within its scope."). And while the majority asserts that the FSLMRS should not be read to "implicitly displace" remedies under Title VII and the ADA, Maj. Op. 10, Title VII predates the CSRA, so "the proposition that '*pre*-CSRA remedies were not meant to be affected by the CSRA is inherently implausible,'" *Lacson*, 726 F.3d at 177 (cleaned up) (quoting *Fausto*, 484 U.S. at 451) (emphasis in original).

Third, the majority overlooks precedents that plainly limit plaintiffs to the processes and remedies of the CSRA, even if that exclusivity closes the courthouse doors to would-be plaintiffs. We have noted that "it is the comprehensiveness of the statutory scheme involved, not the 'adequacy' of specific remedies thereunder, that counsels judicial abstention." *AFGE I*, 716 F.3d at 638 (quoting *Spagnola II*, 859 F.2d at 227). In fact, "the CSRA can preclude a claim from being brought in a district court even if it forecloses the claim from administrative review and [one] has not identified . . . some other kind of procedure for bringing the claim." *Id.* (cleaned up); *see also AFGE II*, 929 F.3d at 756 (explaining that the CSRA can preclude claims even if that makes "it *impossible* to obtain particular forms of review or relief" (emphasis in original)); *Grosdidier*, 560 F.3d at 497 ("Congress designed the CSRA's remedial scheme with care, intentionally providing — and intentionally not providing — particular forums and procedures for particular kinds of claims." (cleaned up)).[8]

---

[8] The majority seeks to limit this line of cases to "systemic or nationwide challenges." Maj. Op. 24–25. But we have never cabined these cases in such a way. *See, e.g.*, *Grosdidier*, 560 F.3d at 497 (stating without qualification that "the CSRA is the exclusive avenue for suit even if the plaintiff cannot prevail in a claim under

Fourth, the majority opinion errs by attempting to divine the congressional intent behind the CSRA by looking to *other* anti-discrimination statutes. The majority notes that "legislative enactments in" the area of employment discrimination "have long evinced a general intent to accord parallel or overlapping remedies against discrimination." Maj. Op. 12 (quoting *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974)). And it observes that employees may bring Title VII and ADA claims against private-sector unions despite also being able to pursue administrative remedies under the National Labor Relations Act (NLRA). *Id*. The majority thus reasons that, "given the norm of concurrent, overlapping remedies for discrimination," Congress "hewed to its longstanding practice of affording employees multiple avenues for relief in this particular context." *See* Maj. Op. 13.

Yet a court may not "disregard" a statute's "text in favor of alleged congressional intent divined from *other* statutes with very different language," even when those other statutes are said to reflect Congress's uniform judgment about how all such statutes should operate. *Corner Post*, 603 U.S. at 815 (cleaned up) (emphasis in original). Precedents interpreting Title VII

the CSRA"). Indeed, we have taken this approach outside the context of systemic or nationwide challenges. *See Graham*, 358 F.3d at 933–35 (explaining that for a plaintiff seeking to challenge his letter of censure — an adverse personnel action for which the CSRA provides no right of review — "the CSRA provides no relief and precludes other avenues of relief"). Rather than being limited to "a specific subset of cases," Maj. Op. 24, the principle that the CSRA may preclude review even if it makes relief impossible reflects the broader tenet that "[t]here is no requirement that Congress' alternative remedy be 'adequate' or that Congress afford a certain kind of tribunal for claims that do not arise under the Constitution," *Spagnola I*, 809 F.2d at 28.

and the ADA shed little light on Congress's intent when it enacted the CSRA's comprehensive and exclusive statutory scheme. Furthermore, the majority's reliance on the norm of overlapping remedies in the private sector is precluded by *Karahalios*. There, the Supreme Court rejected any effort to limit the exclusivity of the CSRA by analogizing it to the NLRA because "[v]ery dissimilarly [to the NLRA], [the FSLMRS] not only expressly recognizes the fair representation duty but also provides for its administrative enforcement." *Karahalios*, 489 U.S. at 534. Indeed, *Karahalios* declined to follow precedents governing private-sector unions when it determined that Congress did *not* "intend[] to furnish a parallel remedy in a federal district court to enforce the duty of fair representation" under the FSLMRS. *Id.* at 532–33.

Fifth and finally, the majority opinion puzzles over why Congress would want to preclude federal court jurisdiction over discrimination claims against federal unions, but not against federal employers or private sector unions. *See* Maj. Op. 19 (stating that "the fundamental question that pervades this case" is "*Why* would Congress have intended to extinguish federal employees' Title VII and ADA remedies and depart from the general norm of overlapping remedies only when they seek to sue their unions, and not when they sue their employers?" (emphasis in original)). We need not ponder that question because, as discussed in detail above, Congress's preclusive intent was clear. *See Badgerow*, 596 U.S. at 16–17 ("However the pros and cons shake out, Congress has made its call."). Nevertheless, I believe that Congress had rational reasons to exclude parallel remedies in this specific context.

As a practical matter, it makes sense for the CSRA to be more protective against discrimination by federal agencies than by federal unions, because employees are more likely to experience discrimination by their employers. *See Meredith v.*

*Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1055 (D.C. Cir. 1999) (noting that the CSRA "was designed to govern the federal employer-employee relationship and to normalize the procedures for sanctioning federal employee misconduct"). That is simply because employees typically interact daily with their employers but much more sporadically with their unions.

Moreover, Congress could afford to be less vigilant in targeting discrimination by federal unions as compared to private sector unions because federal unions have less control over their members' terms of employment. As *Karahalios* noted, courts have found an implied right of action to enforce the duty of fair representation against private sector unions because those unions are "exclusive bargaining agents" that "deprive[] bargaining unit employees of their individual rights to bargain for wages, hours, and working conditions." *Karahalios*, 489 U.S. at 535. The FSLMRS, however, "operates in a different context" because "federal employment does not rest on [collective bargaining] in the private sector sense," and so a federal employee's election of a bargaining agent does not subject her to a "deprivation" that is "comparable to the private sector predicament." *Id.* at 535–36.

Indeed, as *Karahalios* explained, "the collective-bargaining mechanisms created by [the FSLMRS] do not deprive employees of recourse to any of the remedies otherwise provided by statute or regulation." *Id.* at 536 (citing 5 U.S.C. §§ 7114(a)(5), 7121(e)(1)). Thus, federal employees may individually bring grievances under the CSRA and need not rely on their unions to gain access to the grievance process. By contrast, unions in the private sector are often the gatekeeper of employee grievances. *See Bowen v. U.S. Postal Serv.*, 459 U.S. 212, 225 n.14 (1983) ("Most collective-bargaining agreements . . . contain exclusive grievance-arbitration

procedures and give the union power to supervise the procedure. . . . When the collective bargaining agreement provides the union with sole authority to press an employee's grievance, the union acts as the employee's exclusive representative in the grievance-arbitration procedure.").

In sum, differences in the roles played by private-sector and public-sector unions, and in the amount of power that each type of union wields over its members, justify Congress's decision to provide less protection from discrimination by federal-employee unions.

## F.  "High-Level Observations"

The majority closes with some "high-level observations" about our differences, and so will I.  Maj. Op. 28.  My analysis employs traditional tools of statutory construction:  It relies on the statutory text, the *expressio unius* canon of construction, and binding precedents.  *See supra* Parts II.A, II.B.  All of those sources overwhelmingly point to a single conclusion:  That the comprehensive and exclusive scheme of the CSRA precludes Lucas from repackaging the facts underlying her ULP claims as claims under Title VII and the ADA.  By contrast, my colleagues resist going where the law takes us.  They employ unconventional methods to reach an incorrect conclusion:  They rely on "the norm of concurrent, overlapping remedies for discrimination," Maj. Op. 13; they express discomfort with the CSRA's remedies, which they believe are inadequate, *id.* at 13–14; and they ask questions about why Congress would shortchange federal union members, *id.* at 19, and how district courts can be expected to implement the CSRA's preclusive effect, *id.* at 28–29.  In sum, they rest their decision on policy-based doubts about whether Congress meant what it said.  I am unable to agree with my colleagues' non-traditional approach to statutory interpretation.

My colleagues seek to divine what "rule[] of decision" I am "argu[ing] for." Maj. Op. at 28. They categorize my analysis as either some kind of "categorical rule" or a "different rule." *Id.* That attempt to pin down a specific, fully formed, alternative "rule" about how exactly the CSRA applies in various situations misses the boat. The question before us is simply whether the CSRA precludes Lucas from bringing discrimination claims that also are ULPs in federal court. I conclude that it does. I need not decide whether "intentional torts like defamation and assault" fall within the scope of the CSRA because that question is not before us, nor is it necessary to set the exact "bounds" of the CSRA's reach. *Id.*

Moreover, my colleagues express misplaced concern that district courts might have trouble discerning whether facts alleged in a complaint amount to ULPs "on their face." Maj. Op. at 29 ("Nor is it clear how district courts would apply the dissent's 'on its face' standard in practice."); *see also id.* ("Congress generally does not intend for jurisdictional rules to invite extensive threshold litigation that could present serious difficulties for district courts." (cleaned up)). That concern betrays a surprising lack of familiarity with the routine work of the district court in ruling on motions under Federal Rule of Civil Procedure 12(b)(6). District judges have no "difficulties" evaluating whether alleged facts state a claim under any number of statutory schemes, and there is no reason to suppose that the FSLMRS will be their downfall. Indeed, in this case, the district court determined that Lucas's claims fell under the FSLMRS, *Lucas*, 2023 WL 2682175, at \*6–10; and several other judges on the district court also have displayed no "difficulties" in this regard, *see, e.g.*, *Conejo v. Am. Fed'n of Gov't Emps., AFL-CIO*, 377 F. Supp. 3d 16, 26 (D.D.C. 2019); *Doe P v. Goss*, No. 04-cv-2122, 2007 WL 106523, at \*6–11 (D.D.C. Jan. 12, 2007). Furthermore, even if we put aside the discrimination claims at issue here, my colleagues cannot deny

that the CSRA precludes a slew of claims, such as those that state adverse personnel actions. *See, e.g.*, *Nyunt*, 589 F.3d at 448. My colleagues do not explain why determining whether alleged conduct amounts to a ULP is so much more difficult than making such a determination about adverse personnel actions. If I sound "confident[]" on this point, it may be because I am the only member of this appellate panel who has also served as a district court judge. Maj. Op. 29.

The majority is "confound[ed]" by my understanding that Lucas's discrimination claims are ULPs on their face. Maj. Op. 30. But the district court made that finding and Lucas does not contest it. *See Lucas*, 2023 WL 2682175, at *9 (Lucas's Title VII and ADA claims rely on the "very same facts and circumstances" as Lucas's ULP claims before the FLRA.); *World Wide Mins., Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002) ("As we have said many times before, a party waives its right to challenge a ruling of the district court if it fails to make that challenge in its opening brief."). In any event, the law is clear that discrimination by a union against a member of the bargaining unit, like Lucas, is a breach of the duty of fair representation and therefore a ULP under the CSRA, regardless of whether the bargaining-unit member also belongs to the union. *See, e.g.*, *Karahalios*, 489 U.S. at 532; *Jacoby*, 325 F.3d at 309. Indeed, the majority makes no real argument to the contrary. *See* Maj. Op. 15–16. Because a breach of the duty of fair representation does not turn on the victim's union membership, the majority opinion is wrong that my "principal arguments hinge on the view that" Lucas was a union member and that her claims therefore fall within section 7116(b)(4), which makes it a ULP for a union to discriminate in "the terms or conditions of membership in the union." 5 U.S.C. § 7116(b)(4).

35

* * *

The majority opinion raises legitimate concerns about denying federal employees the opportunity to litigate discrimination claims against their unions in federal courts. But a court may not "employ untethered notions of what might be good public policy to expand our jurisdiction." *Badgerow*, 596 U.S. at 16 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 161 (1990)). The text of the statute and the precedents of the Supreme Court and this court make it abundantly clear that the CSRA is comprehensive and exclusive. There is no basis to create an exception that allows a plaintiff to bring parallel suits under Title VII and the ADA in federal court. Lucas therefore cannot bring claims against her union under those statutes, based on facts that facially support ULPs under the CSRA. Accordingly, I respectfully dissent from all but Part II.B of the court's opinion. I would affirm the district court's dismissals of both of Lucas's complaints in their entirety.